# UNITED STATES *v.* ALASKA

No. 118, Orig.   Argued February 24, 1992—Decided April 21, 1992

WHITE, J., delivered the opinion for a unanimous Court.

*Jeffrey P. Minear* argued the cause for the United States. With him on the briefs were *Solicitor General Starr, Acting Assistant Attorney General Hartman, Edwin S. Kneedler,* and *Michael W. Reed.*

*John G. Gissberg,* Assistant Attorney General of Alaska, argued the cause for defendant. With him on the briefs were *Charles E. Cole,* Attorney General, and *John P. Griffin,* Assistant Attorney General.*

JUSTICE WHITE delivered the opinion of the Court.

Ever since the Nome gold rush of 1899 to 1901, the Seward Peninsula in western Alaska has been a focus of attempts

---

*A brief of *amici curiae* was filed for the State of Alabama et al. by *David C. Slade, James H. Evans,* Attorney General of Alabama, *Daniel E. Lungren,* Attorney General of California, *Thomas F. Gede,* and Special Assistant Attorney General, *Charles M. Oberly III,* Attorney General of Delaware, *Robert Butterworth,* Attorney General of Florida, *Michael J. Bowers,* Attorney General of Georgia, *Warren Price III,* Attorney General of Hawaii, *William J. Guste, Jr.,* Attorney General of Louisiana, *Scott Harshbarger,* Attorney General of Massachusetts, *Michael C. Moore,* Attorney General of Mississippi, *Robert J. Del Tufo,* Attorney General of New Jersey, *Lacy H. Thornburg,* Attorney General of North Carolina, *Dan Morales,* Attorney General of Texas, *C. C. Harness III, Mary Sue Terry,* Attorney General of Virginia, and *Kenneth Eikenberry,* Attorney General of Washington.

to gain control over the region's natural riches.  See *In re McKenzie,* 180 U. S. 536 (1901).   The city of Nome sprang to life almost overnight, with some 20,000 gold seekers arriving by vessel in the summer of 1900 when the spring thaw opened up seaward passage.   Since that time, Nome has never been linked to interior Alaska by road—travelers and traders must arrive by air, sea, or dog sled.   This heavy reliance on seaward traffic, and the lack of a natural port in the region, inspired Nome in the early 1980's to develop plans to construct port facilities, including a causeway with road, a breakwater, and an offshore terminal area, extending into Norton Sound.   The implications of this construction for the federal-state offshore boundary lie at the heart of this lawsuit, which comes to us on a bill of complaint filed by the United States.   The question presented is whether the Secretary of the Army may decline to issue a permit to build an artificial addition to the coastline unless Alaska agrees that the construction will be deemed not to alter the location of the federal-state boundary.

## I

On August 25, 1982, the city of Nome applied for a federal permit to build port facilities with the Alaska District Corps of Engineers of the United States Department of the Army under § 10 of the Rivers and Harbors Appropriation Act of 1899 (RHA), 30 Stat. 1151, 33 U. S. C. § 403, and § 404 of the Clean Water Act, 86 Stat. 884, as amended, 33 U. S. C. § 1344.[1]   The Corps issued a Public Notice of Application for Permit on October 20, 1982, and invited interested persons to comment on whether the permit should be granted.   On November 22, 1982, a division of the United States Department of the Interior filed an objection to the issuance of a Department of the Army permit on the ground that Nome's construction of these port facilities would cause an "artificial

---

[1] This recitation of the facts is drawn from the Joint Stipulation of Facts filed with the Court on September 6, 1991.

accretion to the legal coast line." Joint Stipulation of Facts 2. It requested that the Corps require Alaska to waive any future claims pursuant to the Submerged Lands Act (SLA), 67 Stat. 29, as amended, 43 U. S. C. § 1301 *et seq.*, that might arise from a seaward extension of Alaska's coastline caused by the building of these facilities. The Solicitor of the Interior Department issued an opinion to the same effect, stating that the Nome project would " 'move Alaska's coastline or baseline seaward of its present location' " and that " '[f]ederal mineral leasing offshore Alaska would be affected because the state-federal boundary, as well as international boundaries, are measured from the coastline or baseline.' " Joint Stipulation of Facts 2–3. Accordingly, the Solicitor recommended that " 'approval of the permit application be conditioned upon Alaska executing an agreement or a quit claim deed preserving the coastline and the state-federal boundary.' " *Id.*, at 3.

On July 1, 1983, the Corps transmitted the Solicitor's letter to the Alaska Department of Natural Resources and advised the State that the federal permit would not be issued until a " 'waiver or quit claim deed has been issued preserving the coastline and the State-Federal boundary.' " *Ibid.* The Alaska Department of Natural Resources responded on May 9, 1984, by submitting a conditional disclaimer of rights to additional submerged lands that could be claimed by the State as a result of the construction of the Nome port facility. This disclaimer provided that Alaska reserved its right to the accreted submerged lands pending a decision by a court of competent jurisdiction that the federal officials lacked the authority to compel a disclaimer of sovereignty as a condition of permit issuance.[2] After being advised by the De-

---

[2] This disclaimer provides in pertinent part:

"1. Subject to paragraph 4 below, the State of Alaska agrees that the coast line and the boundaries of the State of Alaska are not to be deemed to be in any way affected by the construction, maintenance, or operations of the Nome port facility. This document should be construed as a bind-

partment of Justice that this disclaimer was satisfactory, the Corps completed the permitting process and issued the permit.[3]

On March 11, 1988, the Minerals Management Service of the Interior Department published a "Request for Comments and Nominations for a Lease Sale in Norton Sound and Notice of Intent to Prepare an Environmental Impact Statement," which solicited public comment on the Minerals Management Service's proposed lease sale for minerals, such as gold, near Nome in Norton Sound. *Id.*, at 5. Alaska submitted comments the following month, alleging that the proposed Norton Sound Lease Sale involved submerged lands subject to its Nome project disclaimer and announcing its intention to file a suit challenging the Corps' authority to

ing disclaimer by the State of Alaska to the effect that the state does not, and will not, treat the Nome port development as extending its coast line for purposes of the Submerged Lands Act, again subject to paragraph 4 below.

"2. This disclaimer is executed solely for the purpose of complying with the conditions recommended by the Solicitor of the Department of the Interior and the Attorney General and maintains the status quo of the baseline and the state-federal boundary. It does not affect property or claims to which Alaska is now entitled. It is not an admission by the State of Alaska or by the United States as to the present location of the shoreline, coast line, or the boundaries of the State of Alaska, and is without prejudice to any contention that any party may now or hereafter make regarding such present location.

"3. This disclaimer is entered without prejudice to Alaska's right to file an appropriate action leading to a determination whether the Corps of Engineers has the legal authority to require such a disclaimer before issuing a permit for a project which might affect the coast line.

"4. This disclaimer becomes ineffective and without force and effect upon a final determination by a court of competent jurisdiction in any appropriate action that the Corps of Engineers does not have the legal authority to require such a disclaimer before issuing a permit for a project which might affect the coast line." Joint Stipulation of Facts 3–4.

[3] The Department of the Army permit was later modified to reflect changes in the project. See *id.*, at 5. These changes are not relevant to the legal issues presented in this case.

require a waiver of rights to submerged lands. The State requested that the Minerals Management Service delete from the proposed lease sale the approximately 730 acres in dispute from the Nome project.

The United States then sought leave of this Court to commence this action, which we granted on April 1, 1991. 499 U. S. 946. The two parties entered into an agreement pursuant to § 7 of the Outer Continental Shelf Lands Act (OCSLA), 43 U. S. C. § 1336, and Alaska Stat. Ann. § 38.05.137 (1989), to direct revenues from the disputed acreage into an escrow account that would then be paid to the prevailing party.[4] The United States and Alaska both filed motions for summary judgment, which we now consider.

## II

Our principles for evaluating agency interpretations of congressional statutes are by now well settled. Generally, when reviewing an agency's construction of a statute administered by that agency, we first determine "whether Congress has directly spoken to the precise question at issue." *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842 (1984). Should the statute be silent or ambiguous on the direct question posed, we must then decide whether the "agency's answer is based on a permissible construction of the statute." *Id.*, at 843. In applying these principles, we examine in turn the language of § 10 of the RHA, the decisions of this Court interpreting it, and the longstanding construction of the Corps in fulfilling Congress' mandate.

---

[4] Although the bidding period closed without receipt of any bids, both sides agree that a live controversy exists in light of their continuing disagreement as to the location of the federal-state boundary and the prospect of future lease sales in the area. We agree that the controversy is not moot, since it involves a continuing controversy about territorial sovereignty over these submerged lands. *United States* v. *Alaska*, 422 U. S. 184, 186 (1975).

A

Section 10 of the RHA provides in pertinent part:

> "The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any . . . structures in any . . . water of the United States . . . except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor or refuge . . . unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same." 33 U. S. C. § 403.

The language of this provision is quite broad. It flatly prohibits the "creation of *any* obstruction" to navigable capacity that Congress itself has not authorized, and it bans construction of any structure in any water of the United States "except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army." *Ibid.* The statute itself contains no criteria by which the Secretary is to make an authorization decision; on its face, the provision appears to give the Secretary unlimited discretion to grant or deny a permit for construction of a structure such as the one at issue in this case. The Reports of the Senate and House Committees charged with making recommendations on the Act contain no hint of whether the drafters sought to vest in the Secretary the apparently unbridled authority the plain language of the statute seems to suggest. See H. R. Rep. No. 1826, 55th Cong., 3d Sess. (1899); S. Rep. No. 1686, 55th Cong., 3d Sess. (1899).

The statutory antecedents of this provision similarly offer little insight into Congress' intent. The precursors to § 10 of

the 1899 Act were §§ 7 and 10 of the 1890 River and Harbor Appropriation Act, Act of Sept. 19, 1890, 26 Stat. 454–455. Section 10 prohibited creation of "any obstruction, not affirmatively authorized by law, to the navigable capacity of any waters, in respect of which the United States has jurisdiction," and § 7 made unlawful the building of any "wharf, pier, . . . or structure of any kind outside established harbor-lines . . . without the permission of the Secretary of War." *Ibid.* Congress slightly amended the statute in 1892 to add a prohibition on any construction that would "in any manner . . . alter or modify the course, location, condition or capacity of any port, roadstead, haven, harbor, harbor of refuge, or inclosure . . . unless approved and authorized by the Secretary of War." 1892 Rivers and Harbors Appropriation Act, Act of July 13, 1892, § 3, 27 Stat. 110. This statute reflected the reality that Congress could not itself attend to each such project individually, as it had from the earliest days of the Republic. As the House Report accompanying this law observed: "The most important feature of the bill now presented is the extent it goes in authorizing the Secretary of War to make contracts for the completion of some of the more important works of river and harbor improvement." H. R. Rep. No. 967, 52d Cong., 1st Sess., 2 (1892). "The departure from the old driblet system of appropriations," the House Report continued, "was found to work so well that your committee determined to apply it on a larger scale than in the last act." *Ibid.* See also S. Rep. No. 666, 52d Cong., 1st Sess., 4–5 (1892). By the time Congress passed the 1899 Act, therefore, the idea of delegating authority to the Secretary was well established even if the explanations for the broad language employed by Congress to carry out such a directive were sparse.

## B

The substance of the RHA has been unchanged since its enactment, and the Court has had only a few occasions to decide whether to construe it broadly or narrowly. In one

such case, for example, the Court considered whether to issue a writ of mandamus to order the Secretary of War and the Chief of Engineers to grant a permit to build a wharf in navigable waters. *United States ex rel. Greathouse* v. *Dern*, 289 U. S. 352 (1933). Although it was stipulated that the project would not interfere with navigability, the Secretary nevertheless denied the permit on the ground that the wharf would impede plans developed by the United States to create a means of access to the proposed George Washington Memorial Parkway along the Potomac River in northern Virginia. *Id.*, at 355. The permit applicant argued that the Secretary's refusal to grant it was contrary to law on the theory that RHA § 10 authorized consideration only of the proposed construction's effects on navigation. In refusing to issue the writ of mandamus under equitable principles, the Court noted that petitioners' argument could be accepted "only if several doubtful questions are resolved in [petitioners'] favor," one of which was "whether a mandatory duty is imposed upon the Secretary of War by § 10 of the Rivers and Harbors Appropriation Act to authorize the construction of the proposed wharf if he is satisfied that it will not interfere with navigation." *Id.*, at 357.

Nor has such a broad interpretation of the RHA been exceptional. In *United States* v. *Republic Steel Corp.*, 362 U. S. 482, 491 (1960), the Court observed: "We read the 1899 Act charitably in light of the purpose to be served. The philosophy of the statement of Mr. Justice Holmes in *New Jersey* v. *New York*, 283 U. S. 336, 342 [1931], that 'A river is more than an amenity, it is a treasure,' forbids a narrow, cramped reading of either § 13 or of § 10." And as we stated in a later case: "Despite some difficulties with the wording of the Act, we have consistently found its coverage to be broad. And we have found that a principal beneficiary of the Act, if not the principal beneficiary, is the Government

itself." *Wyandotte Transportation Co.* v. *United States,* 389 U. S. 191, 201 (1967) (citations omitted).

In *United States* v. *Pennsylvania Industrial Chemical Corp.,* 411 U. S. 655 (1973), we applied this broad approach to the RHA in a somewhat analogous situation under a provision enacted contemporaneously with § 10. RHA § 13 provides that the Secretary of the Army "may permit the deposit" of refuse matter "whenever in the judgment of the Chief of Engineers anchorage and navigation will not be injured thereby." 33 U. S. C. § 407. The case presented the question whether the statute *required* the Secretary to allow such discharges where they had no effect on navigation. We held that the statute should not be so construed. In reaching this conclusion, we observed that "even in a situation where the Chief of Engineers concedes that a certain deposit will not injure anchorage and navigation, the Secretary need not necessarily permit the deposit, for the proviso makes the Secretary's authority discretionary—*i. e.,* it provides that the Secretary 'may permit' the deposit." 411 U. S., at 662. We further noted that § 13 "contains no criteria to be followed by the Secretary in issuing such permits," *id.,* at 668, and rejected the argument that the agency's statutory authority should be construed narrowly.

In our view, § 10 should be construed with similar breadth. Without specifying the factors to be considered, § 10 provides that "it shall not be lawful to build or commence the building" of any structure in navigable waters of the United States "*except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army.*" 33 U. S. C. § 403 (emphasis added). In light of our holding in *Pennsylvania Chemical Corp.* that the Secretary's discretion under § 13 was not limited to considering the effect of a refuse deposit on navigation, it logically follows that the Secretary's authority is not confined solely to considerations

of navigation in deciding whether to issue a permit under § 10.[5]

## C

We now examine the administrative interpretation of § 10 down through the years with respect to the range of discretion extended to the Corps and the Secretary. An opinion by Attorney General George W. Wickersham in 1909, for example, denied the Secretary of War and the Chief of Engineers the authority to decide whether to issue a permit under RHA § 10 after "consider[ation of] questions relating to other interests than those having to do with the navigation of the waters." 27 Op. Atty. Gen. 284, 288.

This narrow view of the Secretary's authority persisted within the agency for many decades. "Until 1968," according to one document produced by the Corps of Engineers, "the Corps administered the 1899 Act regulatory program only to protect navigation and the navigable capacity of the nation's waters." 42 Fed. Reg. 37122 (1977). In 1968, the regulations were amended so that the general policy guidance for permit issuance included consideration of "the effects of permitted activities on the public interest including

---

[5] Alaska reads *Pennsylvania Chemical Corp.* differently, suggesting that the case does not relate to the scope of the Corps' permitting authority under RHA § 10, but instead is confined to the issue of how broadly the agency's prosecutorial discretion should be defined. We disagree. Our analysis of the RHA in that case was not at all contingent on the underlying issue relating to a prosecution rather than a permitting decision. We placed great weight on the reading by the federal courts, which "almost universally agreed, as did the courts below, that § 13 is to be read in accordance with its plain language as imposing a flat ban on the unauthorized deposit of foreign substances into navigable waters, regardless of the effect on navigation." 411 U. S., at 671. Alaska also cites *Wisconsin* v. *Illinois,* 278 U. S. 367, 418 (1929), for the proposition that § 10 only authorizes considerations of navigability in permit issuance decisions. We do not read the case in the same way. In our view, *Wisconsin* v. *Illinois* is more properly read to limit the Secretary's authority to issue a permit for nonnavigability reasons when an effect of the project would be to obstruct navigation. *Id.,* at 417.

effects upon water quality, recreation, fish and wildlife, pollution, our natural resources, as well as the effects on navigation." 33 CFR § 209.330(a).[6]

Yet even after the Corps adopted this more expansive reading, which the language of the statute and our decisions interpreting it plainly authorized, the House Committee on Government Operations nevertheless concluded that the Corps in practice was still not interpreting its statutory authority broadly enough. See H. R. Rep. No. 91–917, p. 6 (1970). The Committee was of the view that the Corps' earlier "restricted view of the 1899 act . . . was not required by the law." *Id.*, at 2. The Report summarized our holdings to the effect that the statutory language of RHA § 10 should be interpreted generously, *id.*, at 2–4, and commended the Corps "for recognizing [in 1968] its broader responsibilities" pursuant to its permitting authority under the RHA, *id.*, at 5. The Committee emphasized that the Corps "should instruct its district engineers . . . to increase their emphasis on how the work will affect *all aspects of the public interest*, including not only navigation but also conservation of natural resources, fish and wildlife, air and water quality, esthetics, scenic view, historic sites, ecology, and other public interest aspects of the waterway." *Id.*, at 6 (emphasis added). The Corps did not react to this "advice" until after the Fifth Circuit's decision in *Zabel* v. *Tabb*, 430 F. 2d 199 (1970). There the court upheld the Corps' consideration of environmental factors in its permitting decision even though the project would not interfere with navigation, flood control, or power production. After this decision, the Corps began the long process of changing its regulations governing permit application evaluations. See 42 Fed. Reg. 37122 (1977) (describing historical background of the agency's practice). In 1976, the Corps issued regulations interpreting its statutory authority

---

[6] The prior version of this regulation stated that "[t]he decision as to whether a permit will be issued must rest primarily upon the effect of the proposed work on navigation." 33 CFR § 209.330(a) (1967).

as empowering it to take into account a full range of economic, social, and environmental factors. See 33 CFR § 209.120(f)(1).

The regulations at issue in this lawsuit, therefore, reflect a broad interpretation of agency power under § 10 that was consistent with the language used by Congress and was well settled by this Court and the Army Corps of Engineers. With respect to the breadth of the Corps' public interest review, these regulations are substantially the same as those adopted in 1976 and provide:

> "(a) *Public Interest Review.* (1) The decision whether to issue a permit will be based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest. Evaluation of the probable impact which the proposed activity may have on the public interest requires a careful weighing of all those factors which become relevant in each particular case. The benefits which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments. The decision whether to authorize a proposal, and if so, the conditions under which it will be allowed to occur, are therefore determined by the outcome of this general balancing process. That decision should reflect the national concern for both protection and utilization of important resources. All factors which may be relevant to the proposal must be considered including the cumulative effects thereof: among those are conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership and, in

general, the needs and welfare of the people." 33 CFR § 320.4(a)(1) (1991).

These regulations guide the Secretary's consideration of "public interest" factors to evaluate in determining whether to issue a permit under § 10 of the RHA. To the extent Alaska contends that these regulations are invalid because they authorize the Secretary to consider a wider range of factors than just the effects of a project on navigability, we reject this position. The State's reading of the Secretary's regulatory authority in this respect is inconsistent with the statute's language, our cases interpreting it, and the agency's practice since the late 1960's.

### III

Alaska appears to concede some ground by acknowledging that the Secretary may not be limited solely to issues of navigability in considering whether to issue a § 10 permit.[7] The State in effect contends that, even if the statute authorizes consideration of factors other than just navigability, the regulations authorizing consideration of a project's consequences on the federal-state boundary exceed the Secretary's statutory mandate. The regulation at issue provides in pertinent part as follows:

---

[7] Alaska acknowledges, for example, that the Secretary can take into account the polluting consequences of a project, see Brief for Alaska 17, though the language of § 10 includes no mention of such effects. And a brief filed by numerous States and the Coastal States Organization as *amici curiae* appears to go even further by suggesting that "the Army Corps may deny a permit for the construction of a harbor facility if it is determined that the construction or facility would result in an obstruction to navigation, *endanger human health or welfare, the marine environment, or the economic potential.*" Brief for Alabama et al. as *Amici Curiae* 17 (emphasis added). Plainly these factors are not mentioned in RHA § 10. As our analysis will make clear, the United States is fundamentally correct that there is no legal basis for authorizing the Secretary to consider these factors but not the effects of a project on the federal-state boundary.

"(f) *Effects on limits of the territorial sea.* Structures or work affecting coastal waters may modify the coast line or base line from which the territorial sea is measured for purposes of the Submerged Lands Act and international law. . . . Applications for structures or work affecting coastal waters will therefore be reviewed specifically to determine whether the coast line or base line might be altered. If it is determined that such a change might occur, coordination with the Attorney General and the Solicitor of the Department of the Interior is required before final action is taken. The district engineer will . . . request [the Solicitor's] comments concerning the effects of the proposed work on the outer continental rights of the United States. . . . The decision on the application will be made by the Secretary of the Army after coordination with the Attorney General." 33 CFR § 320.4 (1991).

Alaska advances several arguments why such concerns exceed the scope of the Secretary's authority. We address each in turn.

## A

Alaska's first argument proceeds from the premise that the SLA trumps the RHA for purposes of determining whether the Secretary may condition issuance of a permit on the State's disclaimer of sovereignty over the accreted submerged lands. The SLA establishes that a coastal State's boundary extends seaward "to a line three geographical miles distant from its coast line." 43 U. S. C. § 1312. The seaward boundary of state-owned lands is measured from a base line that is subject to change from natural and artificial alterations. See *United States* v. *California*, 381 U. S. 139, 176–177 (1965); *United States* v. *Louisiana (Louisiana Boundary Case)*, 394 U. S. 11, 40, n. 48 (1969). In applying these rules, Alaska asserts that because the SLA extends a State's boundary seaward three miles from its coastline and

because our decisions have authorized artificial additions to affect determinations of the base line, the Army cannot by agency fiat override the will of Congress, as interpreted by our Court. Cf. *Louisiana Pub. Serv. Comm'n* v. *FCC,* 476 U. S. 355, 376 (1986). According to Alaska, federalism interests should preclude our finding that the RHA confers power on the Secretary to condition issuance of a § 10 construction permit on the disclaimer of a change in the preproject federal-state boundary. See *Organized Village of Kake* v. *Egan,* 369 U. S. 60 (1962).

The United States responds that Congress has already given the requisite authority to the agency through enactment of the RHA, and that the Secretary appropriately complied with that statute. In the Federal Government's view, the RHA sets out an absolute prohibition on construction of "any obstruction" in navigable waters, 33 U. S. C. § 403, and vests discretion in the Secretary of the Army to grant exceptions on a case-by-case basis when a structure is recommended by the Army Corps of Engineers. The United States maintains that the Secretary has the discretion to identify relevant considerations for issuing or denying a permit. Cf. *Jay* v. *Boyd,* 351 U. S. 345, 353–354 (1956).

We find the United States' argument to be the more persuasive one. Contrary to Alaska's position, the agency here is *not* usurping authority. The Secretary is making no effort to alter the existing rights of a State to sovereignty over submerged lands within three miles of the coastline. The SLA makes this guarantee and nothing in the Corps' practice, as exercised in this case, alters this right. What the Corps is doing, and what we find a reasonable exercise of agency authority, is to determine whether an artificial addition to the coastline will increase the State's control over submerged lands to the detriment of the United States' legitimate interests. If the Secretary so finds, nothing in the SLA prohibits this fact from consideration as part of the "public interest" review process under RHA § 10. Were we

to accept Alaska's position, the Federal Government's interests in submerged lands outside the State's zone of control would conceivably become hostage to a State's plans to add artificial additions to its coastline. And if Alaska's reading of the applicable law were followed to its logical extreme, the United States would be powerless to protect *its* interests in submerged lands if a State were to build an artificial addition to the coastline for the sole purpose of gaining sovereignty over submerged lands within the United States' zone, so long as the project did not affect navigability or cause pollution. Alaska points us to nothing in the SLA or to its legislative history that mandates such a result.[8]

It is important to note that neither the SLA itself, nor any of its legislative history, addresses the question of how artificial additions to the coastline affect the 3-mile limit, as we observed in *United States* v. *California,* 381 U. S. 139, 176, and n. 50 (1965). In that case, however, we did hold that international law recognized the seaward expansion of sovereignty through artificial additions to the coastline. *Id.,* at 177. But we also stated that "the Special Master recognized that the United States, through its control over navigable waters, had power to protect its interests from encroachment by unwarranted artificial structures, and that the effect of any future changes could thus be the subject of agreement between the parties." *Id.,* at 176. Alaska suggests that this language should not be read to vest power in the Secretary to condition permits on sovereignty disclaimers because the Special Master's report cited by the Court was written

---

[8] Indeed, the SLA also excepts from its operation "any rights the United States has in lands presently and actually occupied by the United States under claim of right." 43 U. S. C. § 1313(a). Furthermore, as to the lands granted to the States, the SLA provides that "[t]he United States retains all its navigational servitude and rights in and powers of regulation and control of said lands and navigable waters for the constitutional purposes of commerce, navigation, national defense, and international affairs." § 1314(a).

prior to enactment of the SLA. Brief for Alaska 26 (citing *California, supra,* at 143). This contention fails to persuade us, however, because we have already noted that the SLA did not specifically address artificial changes to the coastline, and because our opinion in *California* sanctioned the mechanism exercised by the Secretary in this case: "Arguments based on the inequity to the United States of allowing California to effect changes in the boundary between federal and state submerged lands by making future artificial changes in the coastline are met, as the Special Master pointed out, by the ability of the United States to protect itself through its power over navigable waters." 381 U. S., at 177. Such "power over navigable waters" would be meaningless indeed if we were to accept Alaska's view that RHA § 10 permitted the United States to exercise it only when the State's project affected navigability or caused pollution.[9]

B

Alaska next contends that our decisions do not permit the Secretary to consider changes in federal-state boundaries as part of the § 10 "public interest" review process. First, the State suggests that such consideration would conflict with our decision in *California, supra,* at 176–177. In that case we adopted the Convention on the Territorial Sea and the

---

[9] Alaska's argument is also weakened by the existence of the OCSLA, 43 U. S. C. § 1331 *et seq.,* which provides that the United States has "jurisdiction, control, and power of disposition" over the Outer Continental Shelf, submerged lands identified by Congress as a "vital national resource reserve" of great value. §§ 1332(1) and (3). The "public interest" review undertaken by the Secretary in determining whether to issue a § 10 permit explicitly considers "the effects of the proposed work on the outer continental rights of the United States." 33 CFR § 320.4(f) (1991). Such a consideration in some form has been part of the equation of factors subject to the Secretary's review process since 1969. See 33 CFR § 209.120(d)(4) (1969). It is perfectly consistent with the OCSLA for the Secretary to consider a project's effects on United States' rights to submerged lands in deciding whether to issue a § 10 permit.

Contiguous Zone, Apr. 29, 1958, 15 U. S. T. 1607, T. I. A. S. No. 5639, for purposes of the SLA, explaining that such a result would establish "a single coastline for both the administration of the Submerged Lands Act and the conduct of our future international relations (barring an unexpected change in the rules established by the Convention)." 381 U. S., at 165. Because construction of an artificial port facility will, in certain circumstances, cause a change in the United States' *international* seaward boundary,[10] Alaska contends that the goal of a "single" coastline will be frustrated if we permit the Secretary to establish, in effect, one boundary for international purposes and a different one for domestic purposes.

As the United States maintains, however, our decision in *California* did not specify a "goal" of achieving a "single" coastline. Rather, our purpose was to give the SLA a "definiteness and stability." Such aims, of course, can be achieved without creating perfect symmetry between the Convention and the Act. Stability in a boundary line is achieved when the Secretary decides whether a State must disclaim its rights to accreted submerged lands caused by artificial additions just as surely as it is with ordinary coastline determinations occasioned by natural changes. The State intimates that problems relating to fishing, salvage operations, and criminal jurisdiction will result from "[u]nstable and unpredictable administrative rules [that] will create confusion in many areas." Reply Brief for Alaska 6. Such speculative concerns, however, arise only when the 3-mile

---

[10] Under international law, artificial alterations to the coastline will extend a country's boundaries for purposes of determining the territorial sea and exclusive economic zone. Convention on the Territorial Sea and the Contiguous Zone, Apr. 29, 1958, 15 U. S. T. 1607, T. I. A. S. No. 5639, art. 8; Brief for United States 25, n. 6 (stating that "[t]he United States has not ratified [the United Nations Convention on the Law of the Sea], but has recognized that its baseline provisions reflect customary international law").

boundary itself is indefinite.[11]    But uncertainty in cases such as this one surely ends when the State disclaims its sovereignty over accreted submerged lands.    The 3-mile boundary remains the same.    And in those circumstances in which the Secretary does not require a disclaimer and the 3-mile federal-state boundary extends from the new base line, presumably should there arise any of the federal-state problems Alaska identifies, changes in nautical maps could readily be amended to reflect such changes.    Nothing in the parties' lodgings with the Court suggests why fishermen and other sailors who rely on such charts will suffer prejudice by the rule we announce today.[12]

---

[11] We add that variations between international and federal-state boundaries are not uncommon.    As we recognized in *United States* v. *California*, 381 U. S. 139, 165–166 (1965), changes in Convention rules might render the international and federal-state boundaries noncoincident.    In the SLA itself, Congress recognized the possibility that variations between international and federal-state boundaries might occur by providing that a decree fixed by our Court "shall not be ambulatory" even though erosion or accretion may alter the international boundary.    43 U. S. C. § 1301(b). We also note that the President's proclamation of a 12-mile territorial sea for international law purposes functionally established a distinction between the international and the federal-state boundaries.    See *Argentine Republic* v. *Amerada Hess Shipping Corp.*, 488 U. S. 428, 441, n. 8 (1989). Finally, as the United States accurately points out, some coastal States have created or permitted variations between the international boundary and the federal-state boundaries through compromise agreements reached with the United States.    See *Mississippi* v. *United States*, 498 U. S. 16 (1990).

[12] Alaska also suggests that the regulations at issue in this case conflict with our decision in *Nollan* v. *California Coastal Comm'n*, 483 U. S. 825 (1987), which held that a coastal commission could not condition the granting of a construction permit on the conferring of a public access easement across a landowner's beach.    Alaska quotes language in *Nollan* to the effect that "unless the permit condition serves the same governmental purpose as the development ban, the building restriction is not a valid regulation of land use but an 'out-and-out plan of extortion.'"    *Id.*, at 837.    This rule, however, has no applicability in a situation such as this one, in which we evaluate the statutory authority underlying an agency's action.    *Id.*, at 836.    Even were the *Nollan* situation analogous to that presented here,

Accordingly, we find no merit in Alaska's argument that, in conducting the permit review process under RHA § 10, the Secretary cannot consider a project's effects on the federal-state boundary.

## IV

Finally, Alaska maintains that even if the regulations *are* authorized by the RHA, the Secretary's actions were not consistent with those regulations. The State argues that nothing in the applicable regulations authorizes the Army Corps of Engineers to force a coastal State to abdicate rights to submerged lands as a condition to issuance of a permit for construction of a shoreline project. Alaska suggests that "the regulation addresses activities on submerged lands, not the property interests in the submerged lands." Brief for Alaska 28. Nor can the Secretary derive authority to condition disclaimers on interagency coordination responsibilities, according to the State, because 33 CFR § 320.4(g)(6) (1991) states specifically that "dispute[s] over property ownership will not be a factor in the Corps' public interest decision." Alaska further posits that the regulations at § 320.4(a)(1), which include numerous factors to be evaluated in balancing the public interest, do not make reference to the United States' property interests.

As our analysis in Parts III–A and III–B suggests, we do not find this argument persuasive. The regulations indicate that the Corps may include in its evaluation the "effects of the proposed work on the outer continental rights of the United States." 33 CFR § 320.4(f) (1991). It is untenable to maintain that the legitimate property interests of the United States fall outside the relevant criteria for a decision that requires the Secretary to determine whether issuance of a permit would affect the "public interest." The regula-

---

we note that Alaska would gain no benefit because the purpose behind imposing a condition for issuance of the permit—to protect federal rights to submerged lands—is the same as that for denying the permit.

tions at § 320.4(g)(6), upon which Alaska places some weight, clearly do not speak to property disputes of the type at issue here. Moreover, we are unpersuaded by Alaska's contention that the authority to require disclaimers cannot be inferred from the regulatory scheme. It would make little sense, and be inconsistent with Congress' intent, to hold that the Corps legitimately may *prohibit* construction of a port facility, and yet to deny it the authority to seek the less drastic alternative of conditioning issuance of a permit on the State's disclaimer of rights to accreted submerged lands.

Alaska also makes various challenges to the administrative procedures followed in this case, and especially to the alleged shortcoming of the Secretary in not formalizing the authority to condition disclaimers of sovereignty in the permit-issuance process.[13] The "policy" followed in this case, however, is not contrary to law simply because of its specific omission from the regulations. See *United States* v. *Gaubert*, 499 U. S. 315, 324 (1991) (observing that some agencies "establish policy on a case-by-case basis, whether through adjudicatory proceedings or through administration of agency programs"). Certainly the Corps communicated its intention openly to the appropriate state officials, and therefore did not force Alaska " 'to litigate with agencies on the basis of secret laws.' " *Renegotiation Bd.* v. *Banner-craft Clothing Co.*, 415 U. S. 1, 9 (1974) (quoting the case below, 151 U. S. App. D. C. 174, 181, 466 F. 2d 345, 352 (1972)). See Joint Stipulation of Facts 24a–25a. The United States avers that such disclaimers have been requested on a case-

---

[13] The State also contests the legality of the Secretary's actions in this case under the Administrative Procedure Act, 5 U. S. C. § 706, especially the regulations at 33 CFR § 320.4(f) (1991) that authorize the Secretary to take into account changes in the base line in making § 10 permit issuance decisions. Contrary to Alaska's contention, these regulations were adopted through notice and comment proceedings, see 39 Fed. Reg. 12115 (1974); 38 Fed. Reg. 12217 (1973), as were subsequent amendments, see 51 Fed. Reg. 41220 (1986); 42 Fed. Reg. 37122 (1977).

by-case basis since 1970 and that "Alaska fails to explain why the Corps' approach is improper or what specific advantages would result from identifying the option through a formal regulation." Brief for United States in Opposition 16.

We cannot say that in this case the Corps acted in an arbitrary or capricious manner. It notified state officials promptly that the Solicitor of the Interior Department objected to issuance of the permit; it specified a curative option that could be pursued; and it afforded Alaska ample time to consider the disclaimer, to consult with federal officials, and then to draft the disclaimer. See Joint Stipulation of Facts 2–7, App. to Joint Stipulation of Facts 11a–16a, 17a–19a, 20a–21a, 22a–23a, 24a, 26a–31a. Nor can Alaska contend that it lacked notice, since the disclaimer it filed in this case is similar in form to those which it has filed in past § 10 permit proceedings. See Joint Lodging of Permits and Disclaimers.[14] We conclude that the Corps' actions in this case were neither arbitrary nor capricious.

V

Accordingly, we hold that the Secretary of the Army acted within his discretion in conditioning approval of the Nome

---

[14] Indeed, one such disclaimer dated December 1, 1980, for a project in the oil-rich Prudhoe Bay, stated as follows:

"In consideration of the issuance, by the Secretary of the Army or his authorized representative, of a permit for construction of an extension to the ARCO dock at Prudhoe Bay for purposes of the waterflood project designed to result in substantial secondary recovery from the existing Prudhoe Bay oil and gas field, pursuant to the application filed by ARCO and SOHIO, the State of Alaska agrees that the shoreline, coast line, and boundaries of the State of Alaska are not to be deemed to be in any way affected by the construction, maintenance, or operation of such extension. This Agreement should be construed as a binding disclaimer by the State of Alaska to the effect that the State does not, and will not, treat the ARCO dock waterflood extension as extending its coast line for purposes of the Submerged Lands Act." Joint Lodging of Permits and Disclaimers 5(a)2.

port facilities construction permit on a disclaimer by Alaska of a change in the federal-state boundary that might be caused by the Nome project. The United States' motion for summary judgment is granted, and Alaska's motion for summary judgment is denied.

*It is so ordered.*