999 F.2d 403
 The PEOPLE OF the VILLAGE OF GAMBELL; the People of the
Village of Stebbins, Plaintiffs-Appellants,
v.
Bruce BABBITT,* Secretary of the Interior;
United States Department of Interior,
Defendants-Appellees,
v.
NATIVE VILLAGE OF SAVOONGA; Native Village of Kotlik;
Native Village of St. Michael; Native Village of
Unalakleet; Native Village of Koyuk; Native Village of
Shaktoolik; Nome Eskimo Community; Native Village of
Solomon; Native Village of Teller; King Island Native
Community, Plaintiffs-Intervenors-Appellants.
 No. 92-35037.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 15, 1992.
Decided July 15, 1993.
 
 Joseph D. Johnson, Alaska Legal Services Corp., Anchorage, Alaska, for plaintiffs-intervenors-appellants.
 David C. Shilton, Environment and Natural Resources Div., U.S. Dept. of Justice, Washington, DC, for defendants-appellees.
 Appeal from the United States District Court for the District of Alaska.
 Before: WALLACE, Chief Judge, CANBY and BRUNETTI, Circuit Judges.
 BRUNETTI, Circuit Judge:
 
 
 1
 This matter comes once again before this court on appeal from the district court's grant of summary judgment in favor of the federal defendants and against the appellants Alaskan native villages. The matters in dispute in the instant appeal stem from this panel's prior decision in People of Village of Gambell v. Hodel, 869 F.2d 1273 (9th Cir.1989) (Gambell III ).
 
 
 2
 In Gambell III, we held (1) that the federal government's paramount interests in the Outer Continental Shelf (OCS) did not extinguish the aboriginal rights of the villages, (2) that the United States government has asserted federal sovereignty over the OCS sufficient to compel recognition of aboriginal rights in the OCS, (3) that any claim that aboriginal rights are repugnant to principles of international law is too speculative for present resolution, and (4) that the provisions of the Alaska Native Claims Settlement Act (ANCSA), 43 U.S.C. § 1601 et seq. (1988), do not extend beyond the geographical boundaries of the state of Alaska, and thus do not extinguish aboriginal rights that may exist in the OCS. We reversed the district court's grant of summary judgment in favor of the government, and remanded for the district court to decide three specific questions.
 
 
 3
 First, we directed the district court to decide "whether the Villages in fact possess aboriginal subsistence rights in the OCS," second, "if the Villages do possess such rights, whether the drilling and other activities by the oil companies will interfere significantly with the Villages' exercise of those rights," and third, "whether OCSLA extinguishes aboriginal subsistence rights in the OCS as a matter of law." 869 F.2d at 1280.[1]
 
 
 4
 On remand, the district court did not decide the three questions. Rather, it granted the government's motion for summary judgment because it found that the plaintiff villages had not provided evidence on the second issue sent back for resolution. The district court focused on the Villages' response to a request for admission, which stated in part that:
 
 
 5
 It is admitted that the limited exploration activities conducted to date, standing alone, have not yet significantly interfered with the exercise of the aboriginal subsistence rights of the Village of Gambell [Stebbins], and it is unlikely that the effects of those past activities will lead to any significant interference in the future if no further exploration or development activity occurs.
 
 
 6
 Because the Villages admitted that the oil companies' past exploration activities had not yet interfered with their aboriginal subsistence rights, reasoned the court, the Villages failed to provide evidence on an "element of their claim." Relying on this perceived failure, the district court granted the federal defendants' motion for summary judgment.
 
 
 7
 Because we find that there remains no basis for federal jurisdiction in this case, we do not decide whether the district court's decision on remand was error.[2]
 
 I.
 
 8
 This suit originated in 1983 when the Tribal Villages of Gambell and Stebbins sought to enjoin the Secretary of the Interior from completing the sale of an oil and gas exploration lease pursuant to the OCSLA. This lease, denominated "Sale 57," contemplated exploration and production activity in Norton Sound. Although the Villages' action was directed at Sale 57 in particular, the relief sought was both preliminary and permanent injunction of all leasing activity in the Norton Sound Basin. See Complaint, March 4, 1983, C.R. 1, at pp. 1-2, 5-6.
 
 Sale 57
 
 9
 After the district court denied the Villages' motion for a preliminary injunction, lease Sale 57 was conducted, as scheduled, on March 15, 1983. The litigation continued, progressing back and forth through the federal courts.[3] Meanwhile, the intervenor-defendant oil companies, who had purchased the Sale 57 lease tracts, completed their exploration activities in the region, and began relinquishing the component lease tracts that made up Sale 57.[4] By the time the action came before the district court pursuant to our remand in Gambell III, all the remaining leases from OCS Sale 57 had been relinquished. As a result of this abandonment, all parties joined in a motion to dismiss the action as against the intervenor-defendant oil companies.[5] The court dismissed the action with prejudice as against those defendants on December 3, 1990.
 
 
 10
 Because the component leases to Sale 57 were relinquished prior to the district court's grant of summary judgment, we must address whether the Villages' action is moot with respect to that sale. To the extent that the claim is moot, of course, the federal courts lack Article III jurisdiction to resolve that claim. Iron Arrow Honor Society v. Heckler, 464 U.S. 67, 70, 104 S.Ct. 373, 374, 78 L.Ed.2d 58 (1983) (per curiam).
 
 
 11
 A claim is moot when "the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." Western Oil & Gas Ass'n v. Sonoma County, 905 F.2d 1287, 1290 (9th Cir.1990), cert. denied, 498 U.S. 1067, 111 S.Ct. 784, 112 L.Ed.2d 846 (1991) (citations and internal quotations omitted). The basic question is whether there exists a "present controversy as to which effective relief can be granted." Northwest Environmental Defense Center v. Gordon, 849 F.2d 1241, 1244 (9th Cir.1988).
 
 
 12
 During the pendency of this action, Sale 57 has run its course. The sale was completed, exploration conducted, and the lessees relinquished their interests under the sale. It cannot be said that this dispute is "likely to recur" with respect to lease Sale 57. Western Oil, 905 F.2d at 1290.
 
 
 13
 We therefore hold that the Villages' claims for relief on the basis of lease Sale 57 are moot. Our inquiry does not end here, however.
 
 Continuing Controversy
 
 14
 The Villages also contend that, despite the oil companies' relinquishment of the Sale 57 leases, the action is not moot because a "continuing controversy" exists with respect to the native villagers' aboriginal rights. They rely primarily on the Supreme Court's recent decision in United States v. Alaska, --- U.S. ----, 112 S.Ct. 1606, 118 L.Ed.2d 222 (1992).
 
 
 15
 Rather than compelling a finding that a live case or controversy exists in this case, the Alaska Court's discussion of this issue, contained in a footnote, illustrates why we are not faced with a live controversy here:
 
 
 16
 Although the bidding period closed without receipt of any bids, both sides agree that a live controversy exists in light of their continuing disagreement as to the location of the federal-state boundary and the prospect of future lease sales in the area. We agree that the controversy is not moot, since it involves a continuing controversy about territorial sovereignty over these submerged lands. United States v. Alaska, 422 U.S. 184, 186, 95 S.Ct. 2240, 2244, 45 L.Ed.2d 109 (1975).
 
 
 17
 --- U.S. at ---- n. 4, 112 S.Ct. at 1610 n. 4 (emphasis added). Unlike the State of Alaska in the case cited, the appellants Native Villages do not assert sovereign rights as against the United States. As we recognized in Gambell III, such a claim would necessarily fail as inconsistent with principles of national paramountcy. 869 F.2d at 1276 & n. 3 (citing United States v. California, 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947); Inupiat Community of the Arctic Slope v. United States, 548 F.Supp. 182 (D.Alaska 1982), aff'd on other grounds, 746 F.2d 570 (9th Cir.1984), cert. denied, 474 U.S. 820, 106 S.Ct. 68, 88 L.Ed.2d 56 (1985)). Consequently, there is no continuing dispute over sovereign power in this case.
 
 
 18
 Nor, as this case is presented to us, do we find any concrete, continuing controversy over property rights presented in a form capable of present judicial resolution. The Villages continuously have urged before us their claims to aboriginal hunting and fishing rights, but the only actions of the federal government thus far urged to be inconsistent with those rights were those connected with Lease Sale 57. That controversy is over. This litigation has never been presented to us as a quiet-title action, and we will not permit it to be recast into that form at this late date. The subject matter of this litigation has ceased to exist; the case is moot.
 
 Threatened Harm
 
 19
 In addition to our determination that the Villages' challenge to lease Sale 57 is moot, we must consider whether the absence of a specific controversy over government activity in the Norton Sound renders the Villages' claims for injunctive and declaratory relief unripe.[6]
 
 
 20
 The Villages argue that the "Secretary's pattern of conducting lease sales in the Villages' hunting and fishing grounds and encouraging further OCS development ... demonstrates the persistent and continuing nature of the threat," and that declaratory relief is therefore proper.
 
 
 21
 As mentioned above, the component leases of lease Sale 57 have been relinquished. According to the government, no future lease sales are contemplated in the Norton Sound region. The most recent statement of the government's design concerning the Norton Sound region is the "Proposed Final" Comprehensive Program for Outer Continental Shelf Natural Gas and Resource Management offered by the Department of the Interior's Minerals Management Service.[7] This program, which covers the five-year period from 1992 to 1997, states that the Department "will not consider a sale" in Norton Basin, Navarin Basin, or St. Matthew-Hall during that time period. This final plan rules out the "option" of a limited 1996 lease sale mentioned in an earlier draft of the proposed five-year OCS leasing plan.
 
 
 22
 In examining the threat of future government activity which might infringe appellants' aboriginal rights,[8] we must consider whether this threat presents a concrete case or controversy ripe for judicial review. See Western Oil, 905 F.2d at 1291. We evaluate both the fitness of the issues for judicial decision and the hardship to the parties which would be occasioned by withholding court consideration. Id., citing Abbott Laboratories v. Gardner, 387 U.S. 136, 148-49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967).
 
 
 23
 We find that the Villages have not satisfied the fitness requirement. We are not here presented with a "strictly legal issue." Western Oil, 905 F.2d at 1291. Both the substantive and geographical scope of the particular villages' rights in the OCS depends on historical aboriginal tribal practices. Arriving at a decision as to whether those aboriginal rights exist, what those rights encompass, and whether those rights are infringed by government conduct would involve considerable factual development. This development cannot properly and sufficiently occur absent any tangible prospect of leasing activity in the Norton Sound Basin, as it is impossible to determine the infringement issue without first knowing the scope and nature of the proposed leasing activity.
 
 
 24
 Just as in Western Oil itself, "[i]t remains to be seen whether any [leases in the Norton Sound region] will ever be offered for sale." Id.[9] If no future leases are offered for sale, there will be no attendant pre-lease exploration activity, and no interference with the villagers' exercise of their aboriginal subsistence rights. As a result, this case is "too speculative for resolution by a federal court." Id.
 
 
 25
 Neither have appellants satisfied the "hardship" requirement. "To meet the hardship requirement, a litigant must show that 'withholding review would result in 'direct and immediate' hardship and would entail more than possible financial loss.' " Id. (quoting Winter v. California Medical Review, Inc., 900 F.2d 1322, 1324 (9th Cir.1990)).
 
 
 26
 As mentioned above, no lease sales are contemplated until after 1997. Even if the exploration and development activity which attends those leases does interfere with the natives' exercise of their aboriginal rights, the Villages cannot and do not point to any "direct and immediate" harm that would flow from declining to pass on the merits of their claims today. The government currently is not impeding the villagers' ability or rights to engage in their aboriginal practices. We see no hardship to appellants' aboriginal rights by denying review "when no leases are being offered for bid," nor in fact are any contemplated in the near future. Western Oil, 905 F.2d at 1291.
 
 II
 
 27
 The Villages' claim is moot as to the terminated lease Sale 57. Their objection to potential government activity in the future is unripe. The Villages therefore have not satisfied the "case or controversy" requirement for the exercise of federal jurisdiction under Article III of the United States Constitution.
 
 
 28
 The order of the district court granting summary judgment to federal defendants is VACATED, and this cause is DISMISSED for want of jurisdiction.
 
 
 
 *
 Bruce Babbitt is substituted for his predecessor Manuel Lujan, Jr., Secretary of the Interior, pursuant to Fed.R.App.P. Rule 43(c)(1)
 
 
 [1]
 The Outer Continental Shelf Lands Act (OCSLA) is codified as amended at 43 U.S.C. § 1331 et seq. (1988)
 
 
 [2]
 Neither do we resolve the issue raised in this appeal whether the Villages' claim of "Aboriginal Title" was before this court in Gambell III
 
 
 [3]
 For a synopsis of the procedural history of this case, see People of the Village of Gambell v. Hodel, 869 F.2d 1273, 1275 (9th Cir.1989)
 
 
 [4]
 According to the Declaration of Rodney A. Smith, Regional Supervisor for the Department of the Interior's Minerals Management Service, "all but six of the fifty-nine leases issued pursuant to OCS lease sale 57 (Norton Basin)" had been relinquished by December 1, 1989)
 
 
 [5]
 Joint Motion of All Parties for Order to Dismiss With Prejudice Claims Against Intervening Defendants, and for Other Relief, C.R. 148, October 19, 1990
 
 
 [6]
 Because ripeness is also a threshold jurisdictional issue, we consider this issue nostra sponte. See Sea-Land Service, Inc. v. ILWU, 939 F.2d 866, 870 n. 4 (1991)
 
 
 [7]
 Publication of notice in 57 Fed.Reg. 19308 (May 5, 1992)
 
 
 [8]
 Because the Villages admitted that the oil companies' past exploration activities did not significantly interfere with their subsistence hunting and fishing practices, the district court found it unnecessary to determine the existence and scope of any aboriginal rights the Villages might possess. Those issues remain unresolved
 
 
 [9]
 In Western Oil, a Department of Interior appropriations bill effectively prohibited pre-lease activities in the affected area for up to two years from the date of the decision. 905 F.2d at 1289. In this case, the Interior Department's five-year program makes the prospect of injury even more remote than in Western Oil