SECURITIES AND EXCHANGE COMMISSION, Plaintiff–Appellee,

Henry C. Yuen; Elsie M. Leung, Intervenors–Appellants,

v.

GEMSTAR–TV GUIDE INTERNATIONAL, INC., Defendant.

No. 03–56129.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 7, 2004.

Filed May 12, 2004.

Michelle A. Rice, Stanley S. Arkin, Arkin Kaplan LLP, New York, NY, for the intervenors-appellants.

Richard M. Humes, Thomas J. Karr, Securities and Exchange Commission, Washington, DC, for the applicant-appellee.

Sean T. Prosser, Kimberly S. Greer, Fish & Richardson P.C., San Diego, CA, for the defendant.

Before: TROTT, RAWLINSON, and BEA, Circuit Judges.

BEA, *Circuit Judge:*

**I**

We decide a question of first impression: whether under the Sarbanes–Oxley Act of 2002 ("Sarbanes–Oxley"), 15 U.S.C. § 78u–3 ("Section 1103"), certain termination payments to high-level corporate officials are "extraordinary payments," subject to involuntary retention in an escrow account compelled by court order. Because there was no evidence as to what would be an ordinary payment under comparable circumstances, we conclude that the district court erroneously determined certain payments proposed to be made by Defendant Gemstar–TV Guide International Inc. ("Gemstar") to Intervenors–Appellants Yuen and Leung (hereafter Appellants) were "extraordinary payments" within the meaning of section 1103 of Sarbanes–Oxley. We vacate the district court's order and remand for further proceedings consistent with this opinion.

In view of our ruling, we do not decide whether section 1103 of Sarbanes–Oxley is unconstitutionally vague, or operates in an unconstitutionally retroactive manner.

**II**

**FACTS**

On August 14, 2002, Gemstar, a Delaware corporation, announced that it was

auditing the operations of its Technology and Licensing Sector and Interactive Platform Sector after finding that 2001 revenues and related amortization for these sectors had been overstated by some $40 million. On November 7, 2002, Gemstar announced plans to restructure its management and corporate governance.

As part of the restructuring plans, Gemstar entered into negotiations for termination agreements with its Chief Executive Officer ("CEO"), Dr. Henry Yuen, and its Chief Operating Officer ("COO") and Chief Financial Officer ("CFO"), Elsie Ma Leung. Dr. Yuen's termination agreement provided for a "termination fee" of $22,452,640, an additional $7,030,778 in unpaid salary, bonuses, and unused vacation time, and 5,274,519 shares of restricted stock. Ms. Leung was to receive a termination fee of $6,957,953, an additional $1,209,695 in unpaid salary, bonuses, and unused vacation time, 1,126,504 shares of common stock, and 353,680 shares of restricted stock. Additionally, Yuen agreed to serve as the non-executive chairman of the board and Leung agreed to a position as an employee in the international business department. The arrangements for Yuen's and Leung's compensation are collectively referred to as the Restructuring Payments.

On October 15, 2002, before the Yuen and Leung termination agreements were in final form, attorneys for the Securities and Exchange Commission ("SEC") met with counsel for Gemstar, Yuen, and Leung, and requested that the Restructuring Payments be placed in escrow. On October 17, 2002, the SEC ordered a formal investigation into the announced overvaluation of the revenue and profits from some of Gemstar's sectors. On October 23, 2002, Yuen and Leung notified the SEC that they declined to submit to a voluntary escrow.

On October 28, 2002, as part of its investigation, the SEC issued testimonial subpoenas to Gemstar's Board of Directors. Yuen and Leung contend that in response to the subpoenas Gemstar sent a draft escrow agreement for the Restructuring Payments to the SEC on November 6, 2002. Hours before the restructuring agreements were to be executed on November 7, 2002, Gemstar informed Yuen and Leung's attorney that the Restructuring Payments were to be placed in escrow for six months, and that such escrow provision was non-negotiable. Yuen and Leung acceded to the six-month escrow in "side letters" executed that day.

On March 31, 2003, Appellants Yuen and Leung filed a complaint in district court against the SEC, objecting to the escrow, seeking injunctive and declaratory relief, and requesting a temporary restraining order to unblock and dissolve the escrow to allow the restructuring payments to be made. According to a declaration by Appellants' counsel, "Gemstar is contractually obligated to release the Restructuring Payments to Plaintiffs on May 6, 2003." Appellants' counsel also maintained that the escrow impermissibly interfered with Yuen's and Leung's property rights to receive the Restructuring Payments, and that the escrowed payments did not constitute "extraordinary payments" under section 1103 of Sarbanes–Oxley. Following an April 21, 2003 hearing, the district court denied Appellants' request for a preliminary injunction, finding that the side letters constituted consent by Yuen and Leung to the initial escrow, set to expire May 6, 2003. The district court did not address whether the restructuring payments qualified as "extraordinary payments" under section 1103.

On May 5, 2003, the SEC filed an application with the district court to place the

Restructuring Payments in a 45-day escrow account pursuant to Section 1103. In a declaration filed with the application, an attorney for the SEC described the ongoing investigation of Gemstar. The district court *sua sponte* ordered the parties to maintain the status quo and requested additional briefing. A hearing was held on May 9, 2003. On May 12, 2003, the district court entered an order granting the SEC's application to place the Restructuring Payments in escrow and directed the parties to prepare a joint order to effect such escrow. Appellants filed a motion to reconsider the escrow order on May 22, 2003. After a status conference on May 29, 2003, the court denied Appellants' motion to reconsider and entered the joint order of escrow. The order specifically described the disputed funds as "extraordinary payments" subject to section 1103, and directed that they be held in interest-bearing accounts for 45 days.[1]

On June 19, 2003, the SEC commenced a civil action in the Central District of California, No. 03-CV-4376, alleging Yuen and Leung had fraudulently inflated Gemstar's revenue reports by $223 million, in violation of various sections of the Securities Acts of 1933 and 1934. The SEC also filed an application to have the escrow continued indefinitely for the duration of the action against Yuen and Leung.

On June 20, 2003, on the government's *ex parte* motion, the district court extended the temporary escrow for an additional 45 days. The district court reiterated its finding that the payments were "extraordinary payments" within the meaning of section 1103, and rejected Appellants' contentions that the statute was unconstitutionally vague. On June 24, 2003, the district court entered an order directing the maintenance of the escrow for the duration of the SEC's civil action.

Yuen and Leung filed a notice of interlocutory appeal on July 2, 2003.[2] Appellants contend section 1103(1) is void for vagueness; (2) effects an unreasonable seizure of their property in violation of the Fourth Amendment; (3) does not retroactively apply to the payments in this case that had already been contracted to be paid or had already been made prior to the enactment of the statute; and (4) does not apply to the disputed payments, which are not "extraordinary payments" for the purposes of Sarbanes-Oxley.[3]

## III

### SECTION 1103

Section 1103 of the Sarbanes-Oxley Act gives the SEC authority to ensure that assets of an issuer of securities[4] which

---

1. The record does not indicate location of the escrow or the interest rate applied to the escrow accounts.

2. The notice of appeal specified that Yuen and Leung were appealing only the temporary orders of May 12, 2003, May 29, 2003, and June 20, 2003. The notice of appeal did not include the district court's currently operative order of June 24, 2003. We granted Yuen's and Leung's motion to amend their notice of appeal to include the June 24, 2003 order.

3. At this time, only one other case involving an asset freeze under Sarbanes-Oxley had been published, *See SEC v. Healthsouth Corp.*, 261 F.Supp.2d 1298 (N.D.Ala.2003). *Health-*

*south* does not specifically address what constitutes sufficient evidence of "extraordinary payments" under section 1103. The district court in *Healthsouth* construed the SEC's escrow request as an equitable motion for preliminary injunction and rejected the imposition of an escrow on the ground that the SEC could not show likely success on the merits. The court concluded that "no other basis for granting the relief requested by the SEC exists." *Healthsouth Corp.*, 261 F.Supp.2d at 1317.

4. An issuer is defined as "any person who issues or proposes to issue any security ..." 15 U.S.C. § 78c(a)(8). It is undisputed that Gemstar was, at all times relevant, an issuer

have been fraudulently obtained are not dissipated during the investigation and litigation of securities fraud cases. *See* 15 U.S.C. § 78u–3 (2002). Specifically, section 1103 provides that:

> [w]henever, during the course of a lawful investigation involving possible violations of the Federal securities laws by an issuer of publicly traded securities or any of its directors, officers, partners, controlling persons, agents, or employees, it shall appear to the Commission that it is likely that the issuer will make extraordinary payments (whether compensation or otherwise) to any of the foregoing persons, the Commission may petition a Federal district court for a temporary order requiring the issuer to escrow, subject to court supervision, those payments in an interest-bearing account for 45 days.

15 U.S.C. § 78u–3(c)(3)(A)(i). Such an order can be secured only with notice and after a hearing, unless "impracticable or contrary to the public interest." 15 U.S.C. § 78u–3(c)(3)(A)(ii).

Section 1103 authorizes one additional 45–day extension of the temporary escrow order on a showing of good cause. 15 U.S.C. § 78u–3(c)(3)(A)(iv). However, once the subject of an investigation is charged with a securities violation by the commencement of a civil action, "the order shall remain in effect, subject to court approval, until the conclusion of any legal proceedings related thereto, and the affected issuer or other person, shall have the right to petition the court for review of the order." 15 U.S.C. § 78u–3(c)(3)(B)(i).

Sarbanes–Oxley does not define "extraordinary payments." The SEC is empowered to adopt regulations for the implementation of Sarbanes–Oxley. *See* 15 U.S.C. § 78w. To date the SEC has not done so. Neither Congress nor the SEC

has given any indication as to the meaning of the words "extraordinary payments."

## IV

## STANDARD OF REVIEW

■■■ The district court's escrow order is reviewed for abuse of discretion. *See United States v. Cal–Almond, Inc.*, 102 F.3d 999, 1001 (9th Cir.1996) (affirming denial of motion to impose escrow). The district court abuses its discretion when it applies incorrect legal standards or makes clearly erroneous findings of fact. *Id.* at 1003. The district court's interpretation and construction of a federal statute are questions of law reviewed *de novo*. *SEC v. McCarthy*, 322 F.3d 650, 654 (9th Cir. 2003).

## V

## ANALYSIS

1. Jurisdiction

As a threshold issue, the SEC has argued that this appeal is moot because the orders specified in the notice of appeal are no longer in effect. Mootness is grounded in the Constitution's jurisdictional requirement that federal courts can hear only cases involving an actual case or controversy; mootness preempts any determination on the merits. *See Cammermeyer v. Perry*, 97 F.3d 1235, 1237 (9th Cir.1996). Mootness turns on "whether there exists a present controversy as to which effective relief can be granted." *Village of Gambell v. Babbitt*, 999 F.2d 403, 406 (9th Cir.1993) (citation and internal quotation marks omitted). As noted in footnote 2 above, because the court granted Appellants' motion to amend its notice of appeal to include the district court's order of June 24, 2003, which extended the escrow until the

---

of securities within the meaning of Sarbanes–      Oxley.

completion of the underlying litigation, the SEC's mootness challenge fails.

■ The parties are in agreement that this court has jurisdiction pursuant to 28 U.S.C. § 1292(a)(1). They characterize the escrow order entered by the district court as an appealable Rule 65 preliminary injunction rather than a non-appealable provisional remedy under Rule 64. *See* Fed.R.Civ.P. 64, 65. This issue is not free from doubt, for the escrow order was entered as an exercise of an explicit statutory provision, rather than grounded on any traditional equitable considerations such as are normally required for a preliminary injunction. *See, e.g., Southwest Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 917–18 (9th Cir.2003) (en banc). We are also mindful that jurisdiction of this court cannot be imposed simply by agreement of the parties. *See Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 377, n. 21, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978).

However, in the circumstances of this case, we find that the district court's order is analogous to a preliminary injunction and we have jurisdiction under section 1292(a). *See Cal–Almond, Inc.*, 102 F.3d at 1001 (exercising section 1292(a)(1) jurisdiction and affirming district court's order placing contested advertising and promotion assessments in escrow).

2. Statutory Construction

■ This appeal presents issues of statutory construction of the term "extraordinary payments." In its June 20, 2003 order, the district court correctly noted, " 'extraordinary' in common parlance essentially means 'out of the ordinary' or 'unusual.' Unusual, of course, is a *comparative adjective* that has meaning only in relation to what is 'usual.' " District

Court's June 20, 2003 Memorandum of Decision at 9 (emphasis added).[5] This observation has value only if properly applied. Unfortunately, it was not.

"It would seem that, ordinarily, one could determine what was 'extraordinary' and 'abnormal,' or not normal, only by comparison with what was established to be normal." *Bjelland & Co., Inc. v. United States*, 45 Cust. Ct. 435, 442 (Cust.Ct., Jul. 26, 1960) (on appeal for reappraisement of imported goods, affirming customs appraiser's valuation of good exchanged in the "ordinary course of trade"). Here, plaintiff SEC limited its proof in its section 1103 application to an investigating attorney's affidavit (Cebeci Declaration, Excerpts of Record at 111–58). The affidavit incontestably established the first element of section 1103: that an SEC investigation was under way. 15 U.S.C. § 78u–3(c)(3)(B)(i).

However, the affidavit—and consequently the record—is completely silent regarding what constituted usual or ordinary payments upon termination of a CEO and Chairman of the Board (Yuen) or COO and CFO (Leung) under the same or similar circumstances to those existing at the time that Appellants ended their employment with Gemstar. Absent any such proof, the district court erroneously substituted two conclusory statements of what was "extraordinary" without concomitant proof of what was "ordinary," and an SEC filing, required under a standard different from that of section 1103.

First, the district court found that the negotiation of the termination agreements for Appellants was "extraordinary" because of the various groups that participated in the negotiations and because the negotiations occurred over a five-month period. Members of the Board of Di-

---

**5.** The district court correctly resorted to "common parlance" in interpreting section

1103. *United States v. Migi*, 329 F.3d 1085, 1088 (9th Cir.2003).

rectors, officers of the corporation, and compensation consultants, accountants, and attorneys for both sides negotiated the restructuring agreements. Nothing in the record suggests this extended negotiation constitutes a deviation from the norm for corporate decision-making of this type. While common experience of the district court might help to determine what is the usual way to negotiate the termination of a lawyer at a law firm or a staff member of the court, common experiences of this kind do not aid judgment in the circumstances of Appellants' termination at Gemstar.

As the declaration of Appellants' counsel shows (Excerpts of Record at 15–23), Gemstar–TV Guide was the product of a merger between an off-shore company founded by Appellants and TV Guide, a subsidiary of News Corporation, a large telecommunications company. The corporation's earnings before interest, taxes, depreciation and amortization were reported as $242.2 million in the last nine months of 2000. Appellants presented uncontradicted evidence that revenue-producing strategies of Yuen and Leung differed, if not clashed, with those of News Corp. Appellants were interested primarily in raising revenue attributable to the corporation's sales, perhaps not coincidentally to raise their own compensation, which was tied to revenue and profits. The minority owners, Gemstar's current management, were in part interested in publicizing one of their sister corporations through Gemstar's operations, without paying Gemstar any advertising revenue. Such a strategy would increase revenues for the sister corporation, but not for Gemstar. As owners and officers in Gemstar, Appellants would not share in the profits of the sister corporation.

In case Yuen or Leung were terminated "without cause," lengthy and complex employment agreements governed their termination payments (Supplemental Excerpts of Record at 79, 118). Yuen and Leung had three different components for calculation of their Annual Incentive Bonuses. Complex enough when based on the company's past performance, computations also had to be done for future payments, with the consequent and predictable squabbling over methods for projecting future financial performance.

In view of Gemstar's revenue structure, the conflicting strategies, and the complex schemes for computation of termination payments, it is not surprising that Gemstar would require not only releases, but also representations and warranties from the departing employees. Yet, for all the persons involved in the negotiations, not one presented evidence before the district court that the period or mechanics of the negotiations were out of the ordinary in view of the circumstances. Nor, despite the six-month period between commencement of the investigation (October 17, 2002) and the section 1103 hearing (May 9, 2003), was any expert testimony prepared and presented as to the habits and customs of the marketplace—what was "ordinary"—under the same or similar circumstances.[6]

The second factor on which the district court based its finding that the proposed payments were "extraordinary payments" was their size. *See* Memorandum of Decision at 19. We agree that such sums are "extraordinary payments" in relation to what federal judges are paid. However, nothing in section 1103 constrains us to look through such a prism.

---

**6.** This observation is not to be taken as a direction that, on remand, expert testimony is either required or admissible. As always, the choice of evidence is a matter for the parties. The admission of expert evidence is, in the first instance, a matter for the district court. *See* Fed.R.Evid. 702.

There is no evidence in the record of what similarly placed officers and board members of corporations of similar revenues and worth are paid upon termination. Such payments may be called "golden parachutes" or "golden handshakes" in the press, but purple prose is not enough to prove a statutory requirement in court. For enforcement of the securities laws of the United States, **evidence** of what is "usual" under the same or similar circumstances is necessary to distinguish "extraordinary payments" and to order their impoundment in an escrow pursuant to section 1103.

Last, the district court found it significant that after the termination contracts were finalized, defendant Gemstar chose to report the terms in a Form 8–K filing. A Form 8–K filing is required from an "issuer of securities when substantial events occur ..." *Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 528 n. 6, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974). In this era of heightened corporate vigilance, it is not surprising that Gemstar management should choose to make this report upon the termination of the founders of the company, who were being paid millions of dollars on departure in an amount approximating 15% of the previous year's revenues. But, a discretionary corporate disclosure is not an admission that the company has paid an "extraordinary" amount. In any case, there was also no evidence of whether other "issuers" had made similar reports for similar sums paid to similarly departing upper management under the same or similar circumstances. A "substantial event" may or may not coincide with an "extraordinary payment." Only evidence of comparable events and circumstances can tell us.

Instead of objective evidence, what we have here is the district court's conjecture as to what would have been "ordinary" or "usual" negotiations for termination payments, conjecture as to what the size should have been of such payments and conclusions drawn from filings made under different standards. The bases used by the district court to judge the negotiations, the payments, and the filing were "irreducibly subjective." *cf. Nuñez v. San Diego,* 114 F.3d 935, 943 (9th Cir.1997) (considering vagueness challenge to loitering ordinance).

The district court did not need to rely on such subjective bases. Legislation which uses relative adjectives to proscribe activities is not unknown to the law. Statutes and law prohibit "excessive" verdicts (CAL. CIV. PROC. CODE § 657; Fed. R.Civ.P. 59) and sanction "unreasonable" behavior (CAL. CIV. CODE § 1714; Restatement (Second) of Torts, § 281). It is not beyond the judiciary's capacity to interpret and apply statutes which prohibit "excessive" or "unreasonable" amounts. Trial and appellate courts are called upon to do so every day.[7] As to "excessive," *see*

---

7. For instance, courts are often called upon to determine whether awards of attorney's fees are "reasonable." *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 562, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986). "The fee applicant has the burden of producing satisfactory evidence, in addition to the affidavits of its counsel, that the requested rates are in line with those prevailing in the community for similar services of lawyers of reasonably comparable skill and reputation." *Jordan v. Multnomah County,* 815 F.2d 1258, 1263 (9th Cir.1987) (citation

omitted). The proffered evidence of reasonable fees must constitute "more than a mere 'rough guess' or initial approximation of the final award to be made." *Pennsylvania,* 478 U.S. at 564, 106 S.Ct. 3088.

Likewise, courts daily determine what are "extraordinary" fees in probate courts across the country. But, unlike the district court, those probate courts have elaborate statutes, rules of procedure and case authority to guide them in determining what services by estate representatives are "ordinary" (and covered

*State Farm Ins. Co. v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513, 1519–20, 155 L.Ed.2d 585 (2003). But in doing so, the courts are guided by precepts of proportionality and precedent.

Less often, courts are asked whether some remuneration constitutes "extraordinary payment." An example is the line of cases which determines whether payments made by a corporation to an employee is deductible from gross income as an "ordinary and necessary" business expense, or is an "extraordinary payment" disallowed as a deduction. *See, e.g., LabelGraphics, Inc. v. Commissioner of Internal Revenue,* 221 F.3d 1091, 1096 (9th Cir.2000); *Elliotts, Inc. v. Commissioner Internal Revenue,* 716 F.2d 1241, 1242 (9th Cir.1983).

Whether the adjective is "excessive," "negligent" or "extraordinary," the cases in which those terms appear use similar processes of judgment. The trier-of-fact determines first what constitutes "adequate compensation," "reasonable care," or "customary or ordinary payments." Such determinations require evidence which consists of similar factual situations which can be compared to the case at hand. If the case at hand falls outside the bounds permitted in the comparison cases, that result is deemed "excessive," "negligent," or "extraordinary."

Absent a definition from Congress, "we interpret the words using their 'ordinary, contemporary, and common meaning[s].' " *United States v. Migi,* 329 F.3d at 1088. As is suggested in the district court's order, the statute's qualifying term "extraordinary" necessarily implies proof that the payments deviate from the ordinary. *See Chalmers v. City of Los Angeles,* 796 F.2d 1205, 1215 (9th Cir.1985) (holding that counsel's success was not extraordinary in light of the evidence presented at trial and

the non-complexity of the case). A reasonable interpretation of the common meaning of section 1103 requires that the questioned payments be out of the ordinary. Not mere government assertion, but proof by admissible objective evidence of what is ordinary is necessary to allow a court to determine what is extraordinary. Such evidence was not adduced in the district court; that absence requires the reversal of the judgment of the district court.

## VI

## CONCLUSION

For the reasons stated, Appellants' appeal from the June 24, 2003 escrow order is granted, and that order is vacated and remanded for proceedings consistent with this opinion.

The clerk is directed to stay the mandate in this case for 14 calendar days following the filing of this opinion, should the government seek to file a renewed section 1103 request consistent with the standard of proof outlined in this opinion.

VACATED AND REMANDED; the Clerk shall stay the mandate for 14 days after the filing of this opinion.

TROTT, Circuit Judge, dissenting:

The principal issue we decide in this case arises in a distinctive statutory context that cannot be ignored or slighted. Judge Wallace cogently explained this important context in *SEC v. Rind,* 991 F.2d 1486 (9th Cir.1993):

> When the [Securities and Exchange] Commission sues to enforce the securities laws, it vindicates public rights and furthers the public interest. The public character of Commission action is re-

by the statutory fees) and what expenses are "extraordinary," conferring entitlement to added fees. *See e.g.* CAL. PROB. CODE §§ 10801, 10811; CAL. COURT R. 7.702; *In re Fulcher's Estate,* 234 Cal.App.2d 710, 718, 44 Cal.Rptr. 861 (1965).

flected in the introduction to the 1934 Act: "[T]ransactions in securities ... are affected with a national public interest which makes it necessary to provide for regulation and control of such transactions." 15 U.S.C. § 78b. Congress entrusted the Commission with the vital mission of ensuring the honesty and fairness of the capital markets. "The entire purpose and thrust of a [Commission] enforcement action is to expeditiously safeguard the public interest by enjoining securities violations. The claims asserted in such an action stem from, and are colored by, the intense public interest in [Commission] enforcement of these laws." *SEC v. Asset Management Corp.*, 456 F.Supp. 998, 1000 (S.D.Ind. 1978). *Id.* at 1491. In reversing the district court's decision in this case, I respectfully believe my colleagues have unintentionally overlooked this context, a context which makes the securities business one of the most highly regulated in our nation. In so doing, their opinion deals an unwarranted blow to the public interest and to the Commission's ability adequately to protect that broad interest against the flood of corporate scandals of which Congress and the public has become all too painfully aware in the past few years. Thus, I dissent.

## I

The civil statute under our microscope, Section 1103, 15 U.S.C. § 78u–3(c)(3) is extraordinarily narrow, well defined, and utterly clear. It comes into play only

(1) during the course of a lawful investigation by the Securities and Exchange Commission,

(2) involving possible violations of the federal securities law,

(3) committed by an issuer of publicly traded securities or any of its directors, officers, partners, controlling persons, agents, or employees,

(4) whenever it shall appear to the Commission that it is likely that the issuer will make extraordinary payments to any of those named persons.

*See* 15 U.S.C. § 78u–3(c)(3). In other words, this law covers only insiders making shadowy payments to insiders.

Should this combination of events occur, then Congress has empowered the Commission to petition a federal district court for nothing more onerous than a temporary order requiring the issuer under scrutiny to escrow those intended payments to insiders for no more than 45 days in a very familiar device, an interest bearing account—all of this subject to court supervision.

This protocol on its face bears all the hallmarks and indicia of due process of law and protections for the rights and interests of all concerned in securities matters, including the public and investors. It is a civil law that imposes no penalties, it does not implicate any constitutionally-protected behavior, and it regulates only issuers of publicly-traded securities. Its purpose is to protect corporate funds and the investing public against theft, fraud, and dissipation. As the Commission underscores in its brief, (1) the initial escrow lasts for only 45 days with the possibility of a 45–day extension, *see* 15 U.S.C. § 78u–3(c)(3)(A)(I); (2) any person affected by the escrow order has the right to petition the court for relief, *see* 15 U.S.C. § 78u–3(c)(3)(B)(i); and (3) if no enforcement action is filed before the temporary escrow expires, the "extraordinary payments involved" shall be returned to the issuer or other affected person with accrued interest, *see* 15 U.S.C. § 78u–3(c)(3)(A)(I), (B)(ii). The issue brought to us, of course, arises from Congress' use of the word "extraordinary," and the basic claim is that this word is so vague that it renders this

entire process unlawful. I respectfully believe this claim has no merit.

## II

Faced with one giant corporate scandal after another, Congress' purpose in enacting this mild, temporary measure could not be clearer. One after another, stockholders and others have been left holding an empty bag after corporate insiders engaged in fraud and other corporate crimes at the ultimate expense of the corporation's shareholders and innocent employees. By the time the authorities have been alerted to the fraud, it's too late, the money has already disappeared into the pockets of those who abused their fiduciary responsibilities and the public trust, rendering the traditional remedies used by the Commission to rectify such wrongs— disgorgement, civil penalties, restitution, etc.—difficult if not impossible to pursue. In the meanwhile, the disappearance of such funds impoverishes and damages the issuer itself, once again to the detriment of the shareholders and innocent employees, whose pensions in many cases have been permanently thrashed. Ultimately, our nation is the victim, as the public loses confidence in the stock market.

Section 1103 was initially introduced as Amendment No. 4188, by Senator Trent Lott. *See* 148 Cong. Rec. S6542 (daily ed. July 10, 2002). In the debate that ensued after Amendment No. 4188's introduction, different senators focused on various possible abuses that Section 1103 was meant to prevent:

> Section 3 freezes payments of potential wrongdoers. This section would allow the SEC, during an investigation, to seek an order in Federal court imposing a 45-day freeze on extraordinary payments to corporate executives. Again, this year we have seen just that sort of thing happening. While an investigation is underway, basically rewards were given to those corporate executives. While

it would require a court order, there would be this 45-day freeze. The targeted payments would be placed in escrow, ensuring that corporate assets are not improperly taken from [sic] an executive's personal benefit.... We have also seen that there are some cases where the law had some loopholes or where it was not timely or where it was not strong enough. One example, of course, is where there has been shredding. Another example is the very bad image of corporate executives taking increased payments, extraordinary payments, while they are being investigated. You can't have that sort of thing.

*Id.* (statement of Sen. Lott).

The House of Representatives shared these objectives:

> Under this legislation, top executives will not be allowed to pilfer the assets of the company by giving themselves huge bonuses and other extraordinary payments if the company is subject to an [sic] SEC investigation. Their pay and benefits are frozen when the investigation starts. Americans will know that corporate officers will no longer be able to misuse the bankruptcy laws to discharge liabilities based upon securities fraud, and the honest brokers of corporate America will know that those who abuse the law and tarnish corporate America's reputation will go to jail for a long, long time.

148 Cong. Rec. H4685 (daily ed. July 16, 2002) (statement of Rep. Sensenbrenner).

## III

The facts and circumstances of this case provide a textbook example of the problem. On April 1, 2002, Gemstar filed its Form 10-K for the year 2001. The filing reported that $107.6 million it had previously claimed as revenue had not actually been realized. Gemstar revealed also that

it had previously claimed as substantial revenue receipts from a single "nonmonetary transaction" that was not properly booked. The fall-out from these reevaluations? The next day, Gemstar's stock price declined by a startling 37 percent. But, this was just the beginning. A Form 8–K is a Commission report used to report "material events or corporate changes" that may have an effect on the value of a company's securities. On August 14, 2002, Gemstar announced in a Form 8–K that it intended to restate its 2001 financial results and to reverse $20 million, plus make substantial corrections. Gemstar filed as exhibits to that Form 8–K sworn statements from Yuen and Leung, CEO and CFO respectively, to the effect that they were not able to certify as required by law that some of Gemstar's financial statements were accurate, and that they were not able to comply with Commission orders to do so.

On September 25, 2002, Gemstar filed yet another Form 8–K (1) confirming that it had been notified by NASDAQ that its securities were subject to delisting for failure timely to file a Form 10–Q for the quarter ending on June 30, 2002, (2) that because of an unresolved dispute between Gemstar and its independent auditor KPMG, the company could not file its quarterly Form 10–Q report, and (3) that the resolution of these accounting and financial matters involving restatement of financial statements was "uncertain" and "unpredictable." Clearly, the accounting wheels were falling off this company.

What about Intervenors CEO Yuen and CFO Leung, *whose compensation was tied to the performance of Gemstar's reported financial results?* On March 27, 2002, all of four days before the revelation to the public about Gemstar's inaccurate revenue claims, Yuen disposed of 7 million Gemstar shares, receiving an initial payment of $59 million. No doubt the purchasers of these shares were duped into believing they were getting fair value for their money, only to see the roof fall in when the facts came publicly to light.

Back at the ranch, and simultaneously with the internal and external unraveling of this creative accounting mess, CEO Yuen and CFO Leung were cutting a new deal with Gemstar's Board to resign from their respective executive positions—but remain as employees—in return for a payment in cash by Gemstar to Yuen of $29.48 million and to Leung of $8.16 million, plus enormous shares of stocks and stock options. Gemstar reported these unusual developments on November 12, 2002, in yet another Form 8–K filing. It is this package of payments around which Yuen and Leung fashion their unconvincing and extraordinary claim that the negotiated payments were not "extraordinary," and that the term "extraordinary" is vague.

Not surprisingly, the Commission finally commenced a formal investigation of this odorific scenario to determine whether Gemstar and its former and present officers and directors had engaged in securities fraud by making materially false and misleading public statements regarding revenue, earnings and losses, etc., for the relevant years.

## IV

Here, it is important and instructive to understand what must happen in order for the Commission to launch an investigation into suspected violations of the securities laws, an action which is a prerequisite to petitioning the court under Section 1103 for a temporary escrow.

Both the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act") provide the Commission the authority to initiate investigations into suspected violations of the securities laws. *See* 15 U.S.C. § 77t(a)

("Whenever it shall appear to the Commission ... that the provisions of this subchapter ... have been or *are about to be violated,* it may ... investigate such facts." (emphasis added)); 15 U.S.C. § 78u(a)(1) ("The Commission may ... make such investigations as it deems necessary to determine whether any person has violated, is violating, or is about to violate any provision of this chapter....").

A formal investigation is the process by which the SEC issues subpoenas calling for document production or testimony, supported by the power of the federal courts. To enable the staff of the SEC, rather than the individual, appointed members of the SEC, to perform such an investigation, the Commission must delegate its powers to the staff in a Formal Order of Investigation. That Formal Order of Investigation consists of three parts: 1) a jurisdictional section setting forth the SEC's investigative authority; 2) a probable cause section setting forth the information which, "if true, tends to show" that certain activities have occurred and securities laws have been violated; and 3) a delegation section, containing a statement by the Commission that it is delegating its investigative power to the staff. *See* Marvin Pickholz, SEC Crimes, § 2:4 (Dec. 2003); *see also* Am.Jur. Securities, § 1622 (noting that in most circumstances "[n]either a Commission decision whether to conduct a preliminary investigation nor a formal order of investigation is a final order which may be judicially reviewed").

Here, the Formal Order of Investigation, which was part of the Commission's submission to the district court pursuant to Section 1103, was signed on October 17, 2002. In relevant part, it says:

## II

Members of the staff have reported information to the Commission which tends to show that from at least 1999 to the present:

A. Gemstar and its former and present officers, directors, employees, affiliates, and other persons or entities, directly or indirectly, in the offer or sale of, or in connection with the purchase or sale of Gemstar securities, may have employed a device, scheme, or artifice to defraud, made or obtained money or property by means of an untrue statement of material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or engaged in transactions, acts, practices or courses of business which operated or would operate as a fraud or deceit upon any person. As part of the aforesaid activities, such persons or entities may have, directly or indirectly, among other things, made materially false and misleading statements and may have traded in Gemstar stock while in possession of material nonpublic information in breach of a fiduciary or other duty arising out of a relationship of trust and confidence concerning, among other things, Gemstar's revenues and earnings or losses as set forth in Gemstar's 1999, 2000, 2001 and 2002 Forms 10–K and 10–Q;

B. Gemstar and its former and present officers, directors, employees, affiliates, and other persons or entities failed or caused the failure to file or filed or caused to be filed with the Commission annual reports on Form 10–K and quarterly reports on Form 10–Q which may have contained an untrue statement of material fact or may have omitted to state a material fact necessary, or may have failed to add such further material information as may be necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading concern-

ing, among other things, Gemstar's revenue and earnings or losses.

C. Gemstar and its former and present officers, directors, employees, affiliates, and other persons or entities may have failed to or caused the failure to:

1. make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflected Gemstar's transactions and disposition of assets;

2. devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with Generally Accepted Accounting Principles or any other criteria applicable to such statements, and to maintain accountability for assets;

D. Gemstar and its former and present officers, directors, employees, affiliates, and other persons or entities may have, directly or indirectly, falsified or caused to be falsified, books, records, or accounts required to be maintained by Gemstar.

E. Gemstar and its former and present officers, directors, employees, affiliates, and other persons or entities may have knowingly circumvented or knowingly failed to implement a system of internal accounting controls or knowingly falsified any book, record or account required to be maintained by Gemstar.

F. While engaged in the above described activities, such person or entities, directly or indirectly, made use of the mails or the means, instruments, or instrumentalities of transportation or communication in interstate commerce.

## III

The Commission, having considered the staff's report and deeming such acts and practices, if true, to be in possible violation of Section 17(a) of the Securities Act of 1933 ("Securities Act") and Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B) and 13(b)(5) of the Exchange Act and Rules 10b–5, 12b–20, 13a–1, 13a–13, and 13b2–1 thereunder, finds it necessary and appropriate and hereby:

ORDERS, pursuant to Section 20(a) of the Securities Act and Section 21(a) of the Exchange Act, that a private investigation be made to determine whether any persons or entities have engaged in, or are about to engage in, any of the reported acts or practices or any acts or practices of similar purport or object;

. . . .

The next step in this process is for the Commission to file with the district court an application for a temporary order pursuant to Section 1103. The Commission took this step on May 5, 2003, accompanied by a declaration in support executed by the Commission's attorney authorized to conduct the relevant investigation. Here are excerpts from the declaration, excerpts that sound very much like the allegations of probable cause to be found in a standard search warrant.

8. Since the Commission issued its Formal Order on October 17, 2002, the Commission's staff has taken investigative testimony from 57 witnesses, for 105 days of testimony. The testimony has been taken throughout the United States.

9. The Commission's staff has scheduled the investigative testimony of additional witnesses.

10. Since the Commission issued its Formal Order on October 17, 2002, the Commission's staff has issued regulatory requests to brokerage firms for brokerage account information.

11. Since the Commission issued its Formal Order on October 17, 2002, the Commission's staff has issued over one hundred subpoenas for the production of

documents. Pursuant to the subpoenas for the production of documents, the staff has received substantial document productions in response to the subpoenas.

12. On January 7, 1998, Henry Yuen entered into an Amended and Restated Employment Agreement ("Yuen's Employment Agreement") with Gemstar International Group, Ltd. and Gemstar Development Corp. (collectively with Gemstar–TV Guide International, Inc., "Gemstar"), a copy of which is attached hereto as Exhibit 2.

13. Under Yuen's Employment Agreement, Yuen's initial base salary was $1 million, subject to annual increases that were based on Gemstar's reported financial results. *See* Exhibit 2 at § 3(a).

14. Yuen's Employment Agreement contained a formula under which Yuen's base salary could increase each year, depending upon annual percentage increases in Gemstar's consolidated revenues and consolidated net earnings, as reported in Gemstar's financial statements. *Id.*

15. Yuen's Employment Agreement contained a provision for an annual merit bonus that was calculated using Gemstar's reported financial results. The formula used his adjusted base salary and the annual percentage increase, if any, in Gemstar's consolidated earnings before interest, taxes, depreciation and amortization ("EBITDA"). Yuen could elect to receive his merit bonus in the form of cash or stock options. *Id.* at § 3(b).

16. Yuen's Employment Agreement also included a provision for an annual incentive bonus that was calculated using Gemstar's reported financial results. The formula used his adjusted base salary and increases in Gemstar's consolidated earnings per share as reported in Gemstar's Forms 10–Q and 10–K. Yuen could elect to receive his annual incentive bonus in the form of cash or stock options. *Id.* at § 3(c) & Schedule I.

17. Yuen's Employment Agreement provided Yuen with annual stock options. *Id.* at § 3(d).

18. During the investigation, the staff took Yuen's testimony on April 1, 2003, when he answered general background questions. The staff did not inquire into specific transactions in any detail. Yuen appeared again to provide testimony on April 23, 2003, at which time Yuen asserted his Fifth Amendment privilege against self-incrimination in response to all questions.

19. I have examined Forms W–2 issued to Yuen by Gemstar from 1999 through 2002, and have added the amounts of compensation reported on the Forms W–2 for those four years, which totals $37,849,002.35. The staff understands that this includes salary and wages, as well as monies related to the exercise of stock options.

20. The staff has analyzed brokerage records from Yuen's brokerage firm, including a "Master Agreement" dated March 27, 2002, and confirmations of transactions executed under that agreement. The brokerage records show that between April 3, 2002 and April 8, 2002, Yuen entered into "prepaid forward" transactions to dispose of 7 million shares of Gemstar stock. The brokerage records show that Yuen received an initial payment from the disposition of these 7 million shares of approximately $59 million.

21. A copy of Gemstar's press release, dated October 8, 2001, entitled *Gemstar–TV Guide International, Inc. CEO and CFO Exercise Options to Acquire and Hold Shares,* is attached hereto as Exhibit 3.

22. *On March 31, 1998, Elsie Leung entered into an Amended and Restated*

*Employment Agreement with Gemstar International Group, Ltd. and Gemstar Development Corp. ("Leung's Employment Agreement"), a copy of which is attached hereto as Exhibit 4.*

23. Under Leung's Employment Agreement, her initial base salary was $700,000, subject to annual increases based on Gemstar's financial results. *Id.* at § 3(a).

24. Leung's Employment Agreement included a formula to calculate annual increases in her base salary, which used annual percentage increases in Gemstar's consolidated revenues and consolidated net earnings as shown in Gemstar's financial statements. *Id.*

25. Leung's Employment Agreement included a provision for an annual incentive bonus based upon Gemstar's financial results. The formula for calculating Leung's incentive bonus used her adjusted base salary and increases in Gemstar's consolidated earnings per share as reported in Gemstar's Forms 10–Q and 10–K. *Id.* at § 3(b) & Schedule I.

26. Leung's Employment Agreement further provided Leung with annual stock options. *Id.* at § 3(c).

27. I have examined Forms W–2 issued to Leung by Gemstar from 1999 through 2002, and have added the amounts of compensation reported on the Forms W–2 for those four years, which totals $11,180,561.28.

28. A copy of Gemstar's press release dated October 8, 2002 entitled *Gemstar Approves Management Changes; Jeff Shell to Become CEO,* is attached hereto as Exhibit 5.

29. A copy of Gemstar's press release dated April 18, 2003 entitled *Gemstar–TV Guide Terminates Employment of Yuen and Leung,* is attached hereto as Exhibit 6.

30. A copy of Gemstar's press release dated March 7, 2001, entitled *Gemstar–TV Guide International, Inc. Reports Financial Results For the Quarter and Fiscal Year Ended December 31, 2000,* is attached hereto as Exhibit 7.

31. A copy of Gemstar's press release dated November 14, 2001 entitled *Gemstar–TV Guide International, Inc. Reports Financial Results For the Quarter Ended September 30, 2001,* is attached hereto as Exhibit 8.

32. A copy of Gemstar's press release dated March 18, 2002 entitled *Gemstar–TV Guide International, Inc. Reports Financial Results For the Quarter and Year Ended December 31, 2001,* is attached hereto as Exhibit 9.

33. A copy of the relevant pages of Gemstar's Form 10–K, filed April 1, 2002, is attached hereto as Exhibit 10.

34. A copy of Gemstar's press release dated August 14, 2000, entitled *Gemstar–TV Guide International, Inc. Reports Financial Results of Gemstar International Group Limited For the Quarter Ended June 30, 2000,* is attached hereto as Exhibit 11.

35. A copy of Gemstar's Form 8–K, filed August 14, 2002, is attached hereto as Exhibit 12.

36. A copy of the relevant pages from Gemstar's Form 10–K/A, for the fiscal year ended December 31, 2001, and filed on March 31, 2003, is attached hereto as Exhibit 13.

37. A copy of Gemstar's press release dated January 23, 2003 entitled *Gemstar–TV Guide International Announces Further Anticipated Restatements Related to Previously Disclosed Review,* is attached hereto as Exhibit 14.

38. A copy of Gemstar's press release dated March 10, 2003 entitled *Gemstar–TV Guide International Announces Further Anticipated Restatements Re-*

*lated to Previously Disclosed Review,* is attached hereto as Exhibit 15.

39. On May 2, 2003, the staff provided notice to counsel for Gemstar, pursuant to Local Rule 7–19.1, that the Commission had authorized the staff to file an Application under Section 1103 of Sarbanes–Oxley Act of 2002 to seek a temporary order requiring Gemstar to escrow any extraordinary payments to its employees. The staff informed counsel for Gemstar that the Commission intended to file the Application on May 5, 2003, as early in the morning as possible.

(Emphasis added).

In a supplemental memorandum in support of its application for a temporary order, the Commission made its compelling case that the payments at issue were not regular payments in the everyday operation or normal management of Gemstar. In many instances, the Commission simply pointed out what Yuen and Leung would have been normally entitled to, and then highlighted the differences arising from the suspect Termination Agreements that were not usual and ordinary, and thus "extraordinary." I highlight and quote from the memorandum:

## I. *INTRODUCTION*

The Securities and Exchange Commission ("Commission") seeks a temporary order preventing Gemstar–TV Guide International, Inc., (Gemstar") [sic] from making any extraordinary payments to certain persons for a period of 45 days, under Section 1103 of the Sarbanes–Oxley Act of 2002. Respondent Gemstar does not oppose entry of an order maintaining the status quo. Intervenors Henry C. Yuen and Elsie Leung (collectively "Intervenors") oppose such an order because they contend:

(1) they should be heard before any order is entered;

(2) there is no reason to enter the order on an expedited basis; (3) the payments are not extraordinary under Section 1103; and (4) Section 1103 is unconstitutional.

## II. *ARGUMENT*

A. *The Restructuring Payments are Extraordinary Payments under Section 1103*

The principal issue is whether the Restructuring Payments of $37.64 million in cash are extraordinary payments under Section 1103. Yuen and Leung admit that the *payments are being made pursuant to their November 7, 2002 "Termination Agreements" with Gemstar that were the subject of at least five months of extended negotiation and approval by Gemstar's entire Board of Directors.* (Yuen Memo at p. 9.) Yuen and Leung also admit that the Restructuring Payments were made to effect their removal as Chief Executive Officer and Chief Financial Officer, respectively, and to remove control of Gemstar's Board of Directors from Yuen. *The Restructuring Payments and their circumstances are so extraordinary that Yuen asserted his Fifth Amendment privilege to all questions about his compensation during testimony on April 25, 2003.* Under these circumstances, the Restructuring Payments are extraordinary payments. Yuen and Leung ignore the significant events that are the basis for the Restructuring Payments, and focus only on the components which they characterize as ordinary payments made under "long standing contractual commitments." (*Id.* p. 8.) However, the operative agreements under which the Restructuring Payments are being made are the November 7, 2002 Termination Agreements, entered into on the same day that the payments originally were to be

disbursed by Gemstar. *The Restructuring Payments are being made pursuant to the Termination Agreements, which by their terms supersede all other agreements between the parties. The restructuring was so significant that Gemstar issued a press release announcing it on October 8, 2002, and filed a Form 8–K on November 7, 2002.*

Yuen and Leung also ignore that, *in terms of relationship to annual compensation,* the Restructuring Payments are extraordinary. Yuen is to receive a total of $56.7 million in cash and stock, of which $29.48 million is cash. *This is more than five times Yuen's 2001 base salary of approximately $5 million a year.* Leung is to receive $14.4 million in cash and stock, of which $8.16 million is cash. *Similarly, this is more than six times Leung's 2001 base salary of $1.3 million.*

*There can be little dispute that the Restructuring Payments are not being made in a normal and usual course of business, but rather are "for an exceptional purpose or a special occasion."* Black's Law Dictionary, at p. 406 (Abridged Sixth Edition 1991). Indeed, if there were nothing remarkable about these payments, then Yuen could have testified freely about them on April 25, 2003; instead, he invoked his Fifth Amendment privilege against self-incrimination with respect to all questions about his compensation.

**B.** *The Component Amounts Are Extraordinary Payments Under Section 1103*

Yuen and Leung misdirect the Court away from the events and circumstances of the Restructuring Payments and the total $37.64 million in cash, and focus instead on alleged components of the Restructuring Payments, which they identify as: (1) termination fees or severance payments; (2) accrued unpaid bonuses for 2001; (3) accrued unpaid salary; and (4) accrued unused vacation pay.

*However, the Termination Agreements do not describe the Restructuring Payments as having the same components Yuen and Leung now advance to the Court:* Yuen's Termination Agreement describes the payments as: "(I) a termination fee of $22,452,640 and (ii) $7,030,778 (in *full and complete settlement* for all unpaid salary, bonuses and unused vacation days due under the Current Employment Agreement *or otherwise*)." Leung's is similar. The Termination Agreements state that the single lump sum payments are a "settlement" of amounts due or "otherwise," and not merely simple contractual payments due in the ordinary course. The description in the Termination Agreements is consistent with Intervenors' admission that the Restructuring Payments were the subject of "extended" negotiations, and that *component amounts that make up the lump sum settlement payments in the Termination Agreements are largely different than amounts due under their employment agreements.*

Yuen's and Leung's argument that the Court should look at each component in isolation, and not in context of the events and the governing documents, should be rejected. Under their argument, an extraordinary payment would escape Section 1103 if made up of components that can be characterized as usual or ordinary. Thus, if the Court finds that the "vacation pay" component is not extraordinary, then in the future an issuer and its employees will simply call suspect extraordinary payments "vacation pay" to evade the statute. Section 1103 should not be read in a restrictive manner that would render it meaningless, but rather it should be

read broadly to effect the remedial purposes of the federal securities laws. *See, e.g., SEC v. Zandford,* 535 U.S. 813, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002).

### 1. The termination fees are extraordinary payments

Yuen and Leung admit that the bulk of the funds are a termination fee or severance payment, but do not provide any specific arguments why these are not extraordinary payments under Section 1103. *Yuen and Leung admit that the amount of termination fees were negotiated, and are substantially different than the severance payments they may have been entitled to under their existing employment agreements.* The Termination Agreements provide that Yuen is to receive a "termination fee" of $22.45 million, and Leung a "termination fee" of $6,957,953.

The "termination fees" are the amounts agreed to, after extended negotiation between Gemstar, Yuen, and Leung, as the amounts Gemstar must pay to terminate Yuen and Leung. *Generally, the termination of a chief executive officer or chief financial officer is an extraordinary event, usually accompanied by a public announcement and a Form 8–K filing, as it was here.*

### 2. The accrued unpaid bonuses for 2001

Bonuses are clearly the type of extraordinary payments encompassed by Section 1103. By definition, a bonus is not an ordinary and usual payment, but rather a "consideration or premium paid in addition to what is strictly due" and a "premium or extra or irregular remuneration." As Senator Lott commented about Section 1103: "While an investigation is underway, basically rewards were given to these corporate executives." *Any common sense interpretation of a*

*bonus understands that it is a special reward for meeting or surpassing goals.* Yuen and Leung's 2001 bonuses are exactly the type of payments that should be frozen: their bonuses are rewards for Gemstar's 2001 reported financial results. The Commission is investigating whether Gemstar's 2001 financial results were fraudulently overstated. Since Yuen and Leung (and others) signed and filed Gemstar's 2001 Form 10–K on April 1, 2002, Gemstar has restated and reversed substantial revenue items contained in the 2001 Form 10–K. *The very set of events Section 1103 was designed to prevent is implicated by the bonus payments: while the Commission is attempting to determine whether Gemstar's 2001 financial results were overstated and fraudulent, Yuen and Leung are demanding to be paid for those results.*

*Under their employment agreements, the calculation of Yuen and Leung's bonuses is tied directly to Gemstar's reported financial results.* Yuen's "merit bonus" is calculated using his adjusted base salary and Gemstar's percentage increase in EBITDA (earnings before interest, taxes, depreciation, and amortization). Yuen and Leung each had an identical provision in their employment agreements for an "incentive bonus," calculated based on Gemstar's reported financial results.

### 3. The accrued unpaid salary

The unpaid salary component of the settlement amount is, like the bonus payment component, directly dependent upon Gemstar's reported 2001 financial statements that are under investigation by the Commission. *Yuen and Leung's employment agreements included a formula for the annual adjustment of their base salary. Under that formula, if consolidated revenues or consolidated*

*net earnings increase, then Yuen and Leung's base salary is increased by a proportional amount. (Id., Ex 2, at 18 (Yuen Employment Agreement, ¶ 3(a)); Ex. 4, at 55 (Leung Employment Agreement ¶ 3(a)).*

*The calculation of the "catch-up" salary based upon allegedly fraudulent financial statements is, again, exactly the type of "reward" about which Section 1103 is concerned.* Gemstar has restated hundreds of millions of dollars of revenues from multiple transactions since Yuen and Leung entered into the Termination Agreements. *To the extent Gemstar's reported financial results have been overstated for a number of years (as indicated by the restatements), Yuen and Leung's compensation and bonuses are terminally infected with those overstatements.*

4. *The accrued unused vacation pay*

*The extraordinary nature of the vacation pay amount in the settlement is revealed by the context.* In the ordinary course, an employee would take their vacation time during a year and receive their salary while on vacation. The employee is paid accrued but unused vacation pay only on a special occasion—when their employment is terminated. [Sic] *But for the restructuring and their removal, Yuen and Leung had no contractual rights, under their employment agreements, to be paid for accrued but unused vacation.*

(Emphasis Added).

**V**

Given the context of Section 1103 and the narrowly defined, regulated, and targeted area to which it applies, I conclude that Congress' use of the term "extraordinary" in connection to payments being made by the issuer to those insiders possibly under investigation for potential securities fraud does not constitute a legal or a constitutional infirmity in this statute. "Extraordinary" simply means, in plain language, out of the ordinary. In this context—and the *context* is the key—"out of the ordinary" simply means a payment made not in the customary or normal pursuit of the regular trade or business of the issuer *under scrutiny,* but in response to an irregular or abnormal demand of the moment that reasonably appears to have been provoked or motivated by or connected to the possible violations of securities laws that triggered the investigation.

There is no need necessarily to engage in metaphysical inquiries about what is ordinary in another company or to look to some sort of an industry standard to ascertain the meaning of this provision. One can simply look *at the business* of the issuer and determine whether the payments under scrutiny directly advance the issuer's normal business objectives, or whether the payment reasonably appears to be in the nature of damage control, hush money, taking financial advantage of the fraud, cover-up, looting, etc.

The district court had it exactly right. The court looked *in context* at (1) the circumstances of the payment, (2) the purpose of the payment, and (3) the size of the payment. The court concluded in a thorough, thoughtful, and well-reasoned, 23–page decision that the Commission "has met its burden" "under almost any standard."

The court correctly focused on the nature, purpose, and circumstances of the payments and determined that they had *nothing* to do with Gemstar's ordinary business. The court accurately noted that

[t]he payments were negotiated over a five-month period and involved the participation of the Gemstar Board, a Special Committee, and outside consultants. The Board, the Special Committee, and the Intervenors Yuen and Leung were

each represented by separate sets of counsel. Additionally, the termination agreements were executed as part of the process of removing Leung and Yuen from their positions as Gemstar Officers.

The court concluded that the termination agreements and the disputed payments "are anything but ordinary." I agree. Why? Because the measure of "extraordinary" is what ordinarily goes on in the process of the issuer's business, and these facts are clearly unusual and extraordinary. As the Commission's supplemental memorandum points out, the negotiated Termination Agreement payments here are five and six times greater than Yuen's and Leung's base salary, the component amounts that make up the lump sum payments are different than the amounts due under their employment agreements, the termination fees are different from what they may have been entitled to under existing agreements, the bonuses are fruit of the alleged fraudulent financial results, and the vacation pay item did not exist under their contracts. One would not expect benefits like these to be flowing from corporate assets to executives resigning under fire. This scenario is not business as usual. It appears to be looting. I believe, as did the district court, that Gemstar's execution of *its* overall business objectives and ordinary management of *its* business operations did not entail terminating its CEO and CFO in the shadow of misstated revenues, misleading public statements, securities fraud investigations, plunging stock prices, and public relations debacles, not to mention Yuen's and Leung's inability to certify Gemstar's books as accurate. If these mega-suspicious payments were not "extraordinary," the word needs either to be redefined or to be taken out of our dictionaries. Gemstar's Form 8–K filings raise red flags all over the place.

Do we really expect the government to offer evidence of what constitutes "usual or ordinary payments to a CEO and a CFO under same or similar circumstances," i.e., under threat of delisting, in a fight with its independent auditor, and under investigation for having misstated revenues, cooked the books, defrauded investors, employees and the market, and possibly committed a basket full of crimes? Why would this be necessary? On reflection, the idea that a court needs somehow to have evidence of a "norm for corporate decision-making *of this type*," i.e., rampaging fraud and a world of trouble, seems off the mark. In some cases, one might need to look to a norm, but not this one. Legal "probable cause" statements do not need information about how normal people act to create a reasonable suspicion with respect to the targeted suspects. These insiders appear, from the record submitted to the district court, to be pirates engaged in cookie jar mismanagement of Gemstar. The Commission subsequently sued them for multiple securities fraud violations, seeking anti-fraud injunctions, civil money penalties, and disgorgement of ill-gotten gains, including salaries, bonuses, and proceeds from the sale of stock—each one of which is at the epicenter of the payments at issue. The Commission's complaint alleges that because their compensation was linked to Gemstar's reported financial results, Yuen and Leung reaped millions of dollars in financial gains—in excess salary, bonuses, and options—from their fraudulent manipulations of Gemstar's revenues, to the tune of an overstatement of those revenues by at least $223 million.

Congress designed Section 1103 to add teeth to the Commission's ability to perform its mission. It ensures that recovery by way of disgorgement, etc., is effective rather than empty. As for the importance of disgorgement, we have said,

> Disgorgement plays a central role in the enforcement of the securities laws. The effective enforcement of the federal

securities laws requires that the Commission be able to make violations unprofitable. The deterrent effect of a Commission enforcement action would be greatly undermined if securities law violators were not required to disgorge illicit profits. By deterring violations of the securities laws, disgorgement actions further the Commission's public policy mission of protecting investors and safeguarding the integrity of the markets. Although the Commission at times may use the disgorged proceeds to compensate injured victims, this does not detract from the public nature of Commission enforcement actions: the touchstone remains the fact that public policies are served and the public interest is advanced by the litigation.

*Rind,* 991 F.2d at 1491–92 (citations, internal quotation marks, and alterations omitted).

Finally, the proof of the extraordinary nature of this pudding is in the eating. The multimillion-dollar, suspicious-resignation Termination Agreements, which Yuen and Leung claim are not extraordinary, were approved and signed by Jonathan Orlick, Gemstar's General Counsel, now also a defendant in a civil fraud complaint filed by the SEC, involving fraud allegedly arising out of this same tarnished episode in Gemstar's existence. So much for the ordinary course of business argument.

Yuen and Leung bring other issues to our attention, such as whether Section 1103 is void for vagueness, whether it violates the Fourth Amendment, whether its application here is impermissibly retroactive, etc. These issues also have no merit.

Thus, and with all respect to my colleagues, I dissent.