In the

# United States Court of Appeals
### For the Seventh Circuit

No. 12-3187

HOOSIER ENVIRONMENTAL COUNCIL and
CITIZENS FOR APPROPRIATE RURAL ROADS,

*Plaintiffs-Appellants,*

*v.*

UNITED STATES ARMY CORPS OF ENGINEERS, *et al.,*

*Defendants-Appellees,*

and

INDIANA DEPARTMENT OF TRANSPORTATION,

*Intervenor Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:11-cv-00202-LJM-DML—**Larry J. McKinney**, *Judge.*

ARGUED FEBRUARY 25, 2013—DECIDED JULY 16, 2013

Before BAUER, POSNER, and SYKES, *Circuit Judges.*

POSNER, *Circuit Judge.* This appeal requires us to consider the scope of the duty imposed on the Army Corps of Engineers by section 404 of the Clean Water Act, 33 U.S.C.

§ 1344, and its implementing regulations, to protect wetlands that contain or are covered by waters of the United States (and so are within federal jurisdiction) from environmental degradation by—in this case—the construction of a highway. Wetlands are environmentally significant because they help recharge groundwater sources, filter water, control flooding, and provide a habitat for many animal and plant species, as do the streams that carry water to wetlands, and are also of concern in this case.

Section 404(a) of the Act authorizes the Secretary of the Army (in practice, the Army Corps of Engineers) to issue permits "for the discharge of dredged or fill material into the navigable waters" of the United States. 33 U.S.C. § 1344(a). Implementing regulations state that a permit will be denied if the Corps finds that there is "a *practicable* alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem," 40 C.F.R. § 230.10(a), or if the discharge "would be contrary to the *public interest*." 33 C.F.R. § 320.4(a)(1). The terms we've italicized are the ones critical to this case.

I-69 is an interstate highway (part of the federal interstate highway system) that when completed will run from Canada to Mexico (and of course in the opposite direction as well) through a number of states including Indiana. At present, however, the highway consists of disjointed segments. One of the breaks is between Indianapolis in central Indiana and Evansville in the extreme southwestern corner of the state. A federal interstate highway (I-70) runs between Indianapolis and Terre

Haute. A lesser federal highway, Route 41, runs between Terre Haute and Evansville. As shown in the map below, these two highways form the sides of an approximate right triangle. The direct route between Indianapolis and Evansville is the hypotenuse and thus the shorter of the two routes—142 miles rather than 155 miles long. The roads on the direct route (the hypotenuse) tend to be narrow and crowded with truck traffic and to experience an above-average incidence of traffic accidents. The Federal Highway Administration and the Indiana Department of Transportation (the latter a defendant in this suit by environmental groups; the other principal defendant is the Army Corps of Engineers) decided that a worthwhile contribution to the completion of I-69 would be to build an interstate highway on the hypotenuse. The highway would thus be a segment of I-69. The circled area on the map indicates a completed section of the new highway, section 3, that is the immediate subject of this lawsuit.

### ALTERNATIVE ROUTES FOR I-69 FROM INDIANAPOLIS TO EVANSVILLE



Environmentalists opposed building a highway on the direct route on the ground that it would destroy wetlands, disrupt forests, and also disrupt "karst" ecosystems,

unusual landscapes permeated by caves and other formations that provide rich habitats for wildlife, including such endangered and threatened species as the Indiana bat (endangered) and the bald eagle (threatened). See U.S. Fish & Wildlife Service Midwest Region, "Karst Ecosystems," www.fws.gov/midwest/ecosystemconservation/karst.html (visited July 1, 2013). Most of the environmental concerns have been resolved, however; this case is concerned just with the filling of wetlands and of stream crossings. Filling stream crossings means placing gravel, rock, or dirt in a stream in order to support a road that bridges the stream or even blocks it, in which event however a culvert can be built in order to conduct the stream under the road. The Clean Water Act requires a permit to fill streams that are waters of the United States—that is, that are within federal jurisdiction, as the waters affected by the highway are. The permit granted by the Corps allows six streams in section 3 to be filled where the highway crosses them, in addition to permitting the destruction of wetlands. The two types of action—destroying wetlands and filling streams—are the actions challenged as violations of the Clean Water Act. To simplify exposition, we'll ignore the streams.

The plaintiffs advocate, in lieu of the new highway, simply upgrading to federal interstate highway standards the 88-mile stretch of Route 41 from Terre Haute to Evansville. That would bring the entire Indianapolis-Evansville route up to those standards. The environmental impact would be slight because all that would be involved would be upgrading an existing highway that occupies only 57 percent (88/155 miles) of the indirect route. This

suggested alternative to the new highway would also be $1 billion cheaper ($1 billion versus $2 billion).

The federal and state highway authorities filed, as they were required to do, Environmental Impact Statements, which concluded that building a new interstate highway on the direct route was preferable to upgrading the indirect route. After a suit contending that the highway would violate the National Environmental Protection Act failed, *Hoosier Environmental Council v. U.S. Dept. of Transportation*, No. 1:06-cv-1442-DFH-TAB, 2007 WL 4302642, at *1 (S.D. Ind. Dec. 10, 2007), the highway authorities began addressing the exact location of the highway within the direct route and the placement of structures ancillary to the new highway, such as bridges and culverts. The proposed highway was divided into six sections. Sections 1 through 3 have been built; sections 4 through 6 have not yet been built though section 4 is under construction. Section 3, a 26-mile stretch, is as we said the immediate subject of this case. The grant of the Clean Water Act permit for section 1 was not challenged. The grant of the permit for section 2 was challenged, but that case has been stayed to await the outcome of this case. We don't know the current status of challenges, if any, to the other sections.

In considering the permit application for section 3, the Corps concentrated on the likely effect on wetlands (and on stream crossings, but as we said we're ignoring those in the interest of simplicity) of the six bridges planned to cross the new highway in that section. The Corps concluded that the bridges wouldn't violate the Clean

Water Act because no less environmentally damaging alternative was practicable and this section of the highway was not contrary to the public interest. Damage to wetlands would be modest and would be offset by the creation of new wetlands, as would be required by the Clean Water Act permit that the Corps would issue.

The plaintiffs don't disagree with the Corps' conclusion that the plan for section 3 of the highway minimizes the wetland effects of that section. Their objection is to the choice of the direct route (the hypotenuse), of which section 3 is just one slice, over the indirect one. They argue that the Corps failed to consider whether the direct route as a whole, rather than one section of it, would be in the public interest and whether the indirect route (upgraded as we explained earlier) would be a practicable alternative. But the district court found the Corps' analysis adequate to justify the grant of the permit and so awarded summary judgment to the defendants, precipitating this appeal.

The Indiana Department of Transportation argues that the case is moot. Section 3 of I-69 has been built, was opened to traffic last November, and is now in full use. It is too late, therefore, the Department argues, for a court to provide the relief sought by the plaintiffs. That is not correct. A case is moot only if "it is *impossible* for a court to grant any effectual relief *whatever* to the prevailing party," *Decker v. Northwest Environmental Defense Center*, 133 S. Ct. 1326, 1335 (2013) (emphasis added), quoting *Knox v. Service Employees Int'l Union, Local 1000*, 132 S. Ct. 2277, 2287 (2012), as when a case is settled. One

possibility for relief in this case would be an injunction requiring the defendants to rip up section 3 and re-create the wetlands it has destroyed. See, e.g., *Hillsdale Environmental Loss Prevention, Inc. v. U.S. Army Corps of Engineers*, 702 F.3d 1156, 1166-67 (10th Cir. 2012); *United States v. Bailey*, 571 F.3d 791, 804-06 (8th Cir. 2009); Mark C. Rouvalis, Comment, "Restoration of Wetlands Under Section 404 of the Clean Water Act: An Analytical Synthesis of Statutory and Case Law Principles," 15 *Boston College Environmental Affairs L. Rev.* 295, 298-300 (1988). That would be an extreme measure, unlikely to be ordered, but the fact that relief is unlikely does not render a case moot.

But we find almost incomprehensible the plaintiffs' failure, which they do not mention in their briefs and were unable to explain at the oral argument, to have sought a preliminary injunction against the construction of section 3—or indeed against the construction of any segment of the I-69 project, since their contention is that the indirect route is superior to the direct one and that the Corps was required to compare both routes in their entirety. A motion for a preliminary injunction might well have been denied, but the denial of a preliminary injunction is immediately appealable and would have brought the litigation to a swifter conclusion. By their lassitude the plaintiffs have increased substantially the cost of the relief they seek, for now that cost would include the cost of destroying section 3; and the cost of an injunction is a material consideration in whether to grant it. But this is not an issue we need pursue, as we don't think the plaintiffs are entitled to relief in any event. Anyway all this has nothing to do with mootness.

So on to the merits, where the first issue is the scope of the Corps of Engineers' duty to consider alternatives to proposed projects that threaten wetlands. Did it adequately consider whether the indirect route was a practicable alternative to the direct route? If it was practicable, and superior from an environmental standpoint, then the "practicable alternative" regulation required the Corps to deny a Clean Water Act permit for the direct route.

An alternative is "practicable" if it is "capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2). With cost, technological feasibility, and relative environmental impacts not disputed, the only question is whether the indirect route would achieve the "overall project purposes."

Because of the magnitude of the project to fill the I-69 gap between Indianapolis and Evansville, the planning for it has, as is authorized, 23 C.F.R. § 771.111(g); 40 C.F.R. §§ 1502.20, 1508.28; see, e.g., *Nevada v. Dept. of Energy*, 457 F.3d 78, 91-92 (D.C. Cir. 2006), proceeded in two separate stages, conventionally but unilluminatingly termed "Tier I" and "Tier II." "Tiering refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the

statement subsequently prepared." 40 C.F.R. § 1508.28. Tiering enables agencies "to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review." § 1502.20.

Tiering is common in highway projects, see *Shenandoah Valley Network v. Capka*, 669 F.3d 194, 196-97 (4th Cir. 2012); *Sierra Club v. U.S. Army Corps of Engineers*, 295 F.3d 1209, 1220-21 (11th Cir. 2002); *Conservation Law Foundation v. Federal Highway Administration*, 24 F.3d 1465, 1474-75 (1st Cir. 1994), which (federal highway projects in particular) often are both complicated and protracted. The aim of the Tier I analysis of the Indianapolis-Evansville project was to pick the "corridor"—the route, about 2000 feet wide, within which the highway would be located. It was at Tier I that the direct route was picked over the indirect one. Obviously the highway itself would not be 2000 feet wide. Determining its exact placement within the corridor (its "alignment") was deferred to the Tier II analysis.

It was at Tier II that the preferred alternative—a highway on the direct route—was divided into six sections. As the plaintiffs point out, the highway authorities may not shirk responsible analysis of environmental harms by "segmentation," *Swain v. Brinegar*, 542 F.2d 364, 368-71 (7th Cir. 1976) (en banc); *Indian Lookout Alliance v. Volpe*, 484 F.2d 11, 19-20 (8th Cir. 1973), that is, by evaluating those harms severally rather than jointly. The environmental harms caused by section 3 are modest when the possibility of re-creating the wetlands destroyed by the

section is taken into account. But without an estimate of the environmental harms likely to be caused by all six sections, the Corps of Engineers would be unable to determine the aggregate environmental damage that a highway on the direct route would cause. Yet given the alignment (locational) options within each route (that is, where precisely to locate a highway in each 2000-foot corridor slice) and also the options concerning the number and siting of ancillary structures such as bridges, culverts, and rest areas, an attempt at an exact comparison of the effect on wetlands of all possible alternative routes would have made the Tier I analysis unmanageable.

There is a difference between "segmentation" in its pejorative sense, and—what is within administrative discretion—breaking a complex investigation into manageable bits. *Klemme v. Sierra Club*, 427 U.S. 390, 412-15 (1976). The Federal Highway Administration's Environmental Impact Statement, issued as part of the Tier I analysis, had compared the effects on wetlands of the two corridors. It had found that the indirect route would harm only between 22 and 40 acres of wetlands and the direct route 75 acres. The alignment of the highway and the number and location of ancillary structures could affect these figures, but those determinations were properly deferred to Tier II.

The Corps' role was simplified by the fact that it is required to assess the environmental impacts only of the "practicable" alternatives. The selection of the corridor, involving a comparison of alternatives that is likely to illuminate practicability, is a task in the first instance

for the transportation agencies, in this case the Federal Highway Administration and the Indiana Department of Transportation. The Corps of Engineers is not responsible for the interstate highway system. At the same time the transportation agencies are not free to ignore environmental impacts. They must indicate in the Environmental Impact Statement that is required for any major project, such as an interstate highway, the likely environmental consequences of their choice of corridor. 42 U.S.C. § 4332(2)(C); 23 C.F.R. § 771.133; *Simmons v. U.S. Army Corps of Engineers*, 120 F.3d 664, 666 (7th Cir. 1997); see also Council on Environmental Quality, "The National Environmental Policy Act: A Study of Its Effectiveness After Twenty-five Years" 9 (January 1997), www.blm.gov/or/regulations/files/nepa25fn.pdf (visited July 1, 2013). The destruction of wetlands is an environmental harm. Executive Order 11990, "Protection of Wetlands," 42 Fed. Reg. 26961 (May 24, 1977). So the highway agencies must estimate the impact of a proposed highway on wetlands. And to do that they must consult agencies that have environmental responsibilities, 42 U.S.C. § 4332(2)(C), such as the EPA and the Corps of Engineers. The highway agencies did that and with the advice they received concluded that upgrading the indirect route was not a practicable alternative—the direct route was the least environmentally damaging corridor alternative that was practicable. And while the damage was greater than would result from upgrading the indirect route, it was modest—75 acres of wetlands (less than 12 percent of one square mile) to be re-created elsewhere.

The Corps of Engineers reviewed a draft of the En-
vironmental Impact Statement before it was issued and
concurred in the statement's analysis of the alternatives
(the direct and indirect routes). It did not formally approve
the direct route at Tier I because it wanted the addi-
tional information that the Tier II analysis would pro-
vide—information that would enable it to determine the
effects on wetlands of alternative highway configura-
tions within the preferred corridor. So although participat-
ing in the Tier I corridor determination the Corps
deferred its consideration of the detailed impact on
wetlands, and on the public interest more broadly (for
remember the two separate regulations that it must
apply before it may issue a Clean Water Act permit), until
as a result of the Tier II analysis it knew exactly where
the new highway and its crossings and any other
ancillary structures were planned to be.

The Tier II analysis required sectioning in order to be
manageable. Once it was decided that the aggregate
wetlands damage that the new highway would create
was modest, the further task of determining the optimal
alignment of the highway, and the optimal location and
design of ancillary structures, within each section to
minimize wetlands damage could best be performed
piecemeal. The highway wasn't going to be built all at
once. Construction would start at its southernmost point
and Clean Water Act permits would be granted or denied
when the analysis of the wetland effects of alternative
configurations was completed for each segment. The Corps
might have had either to devote six times the resources to
conduct the permit analysis for all six sections at once, to

the prejudice of its other assignments, or to have delayed the start and completion of construction for years as a smaller staff did first section 1, and then section 2, and so forth but did not grant a permit until it had analyzed all six sections. Instead, moving section by section and coming to section 3, the Corps assessed the impact on wetlands both of alternative locations of the highway within the corridor and of alternative locations for the crossings in section 3, and it decided that the planned locations were superior to any other possible locations in that section.

The Corps explained that "in light of [the Federal Highway Administration's] detailed alternatives analysis [in Tier I] of alternative corridors for the Interstate 69 project," which had determined that the direct route was the least environmentally damaging *practicable* alternative, the Corps needed to consider only the choice between on the one hand alternative alignments within the direct route, and on the other hand not building the highway at all if the direct route was also impracticable. For it was apparent from the Tier I analysis that the indirect route had too many serious drawbacks to be considered "practicable." The direct route was shorter, would provide convenient access to more towns, notably Bloomington with its large public university (the main campus of Indiana University), and would reduce the number of traffic accidents. The indirect route would reduce travel time between only a few towns in southwest Indiana and do little to reduce traffic congestion, traffic accidents, or pollution from traffic. The effect on wetlands of either route would as we know be modest.

Although the Corps has an independent responsibility to enforce the Clean Water Act and so cannot just rubberstamp another agency's assurances concerning practicability and environmental harm, it isn't required to reinvent the wheel. If another agency has conducted a responsible analysis the Corps can rely on it in making its own decision. After all, it is permitted to rely (though not uncritically) on submissions by private permit applicants and on consultants, see *Van Abbema v. Fornell*, 807 F.2d 633, 638-42 (7th Cir. 1986); *Hillsdale Environmental Loss Prevention, Inc. v. U.S. Army Corps of Engineers, supra*, 702 F.3d at 1170-71; *Greater Yellowstone Coalition v. Flowers*, 359 F.3d 1257, 1270-71 (10th Cir. 2004); *Friends of the Earth v. Hintz*, 800 F.2d 822, 834 (9th Cir. 1986) ("the Corps' regulations do not require the Corps to undertake an independent investigation or to gather its own information upon which to base" an environmental assessment), and it necessarily relies heavily on them—so why not on federal agencies that have relevant responsibilities and experience?

For the Corps to assume unilateral responsibility for determining the acceptability from a transportation standpoint of alternative highway projects would usurp the responsibility that federal and state law have assigned to federal and state transportation authorities. The wetlands tail would be wagging the highway dog. The Corps would have to bulk out its staff with experts on highway design, construction, and transportation. The duty of the Corps is "to determine the feasibility of the least environmentally damaging alternatives that serve the basic project purpose." *Utahns for Better Trans-*

*portation v. U.S. Dept. of Transportation*, 305 F.3d 1152, 1189 (10th Cir. 2002). The basic purpose of the I-69 highway project was to be, and has been, determined elsewhere in government.

The Corps' reliance on findings of other agencies relating to the central functions of those agencies is an example of what economists call the division of labor; it reaps the benefits of specialization; it is both efficient and inevitable. Different agencies have different comparative advantages in resolving different issues and therefore need not duplicate each others' studies; instead they can use the results of those studies as inputs into their own determinations. Unsurprisingly the applicable regulations expect the agencies to collaborate, 40 C.F.R. § 230.10(a)(4), as they did in regard to the I-69 project. The highway administrations determined not unreasonably that the overall purposes of the new highway project could not be fulfilled by the indirect route. The Corps could proceed from there to determine whether the effect on wetlands of the direct route had been minimized. The Corps found that the plan minimized damage to wetlands in section 3 by the way it configured the alignment of the highway and the number, location, and design of the auxiliary structures and by the provision for re-creating elsewhere the wetlands that the highway would destroy.

The plaintiffs criticize some of the analysis conducted by the highway administrations and adopted by the Corps. They note an erroneous statement in the analysis of alternative routes in the Environmental Impact State-

ment: the indirect route "provides no benefit on . . . increased access to major institutions of higher education." Actually the indirect route would enable 122,000 more persons to drive to a major institution of higher education (defined as an institution enrolling more than 5000 students) within an hour. But the direct route will give 446,000 persons the same improved access to higher education. And this is just one of the improvements that the direct route when completed will make to the transportation network of southwestern Indiana.

A second error alleged is that the analysis of alternatives rejected the indirect route in part because it "would require the largest number of business relocations (70-131) as well as a moderately high number of home relocations (264-335)," when in truth the direct route requires comparable numbers: "76 business relocations and 390 home relocations." So which route would require more relocations is unclear, and of course relocations may differ greatly in their consequences. But there was no error; the figures are correct and were acknowledged in the analysis. The plaintiffs just wish the highway agencies had weighed this factor more heavily. They were not required to do so. The amount of relocation was never thought to be decisive; it was just one factor among many to be considered in assessing the practicability of the alternative corridors.

We have yet to consider whether the Corps of Engineers conducted an adequate public interest review, as required by the second regulation that we quoted from at the outset and now must quote in full:

The decision whether to issue a permit will be based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest. Evaluation of the probable impact which the proposed activity may have on the public interest requires a careful weighing of all those factors which become relevant in each particular case. The benefits which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments. The decision whether to authorize a proposal, and if so, the conditions under which it will be allowed to occur, are therefore determined by the outcome of this general balancing process. That decision should reflect the national concern for both protection and utilization of important resources. All factors which may be relevant to the proposal must be considered including the cumulative effects thereof: among those are conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership and, in general, the needs and welfare of the people.

33 C.F.R. § 320.4(a)(1); see also *Sierra Club v. Sigler*, 695 F.2d 957, 975 (5th Cir. 1983).

It would be unrealistic to think that the Corps could, within a reasonable time and with its limited resources—not to mention the limits of human knowledge—actually analyze each of these factors in depth, attach a weight to each, and by adding up all the weights determine whether to approve a project. The regulation is overly ambitious, and should perhaps be considered aspirational. Especially when as in this case the Corps is given a chance to and does weigh in on the highway agencies' analysis of the relative benefits and costs of a proposed highway project, it should be able to rely on that analysis, if it is a responsible analysis, while conducting its own analysis of those factors that are within its competence, such as effects on wetlands.

Indeed as an original matter one might have thought that since the concern of the Clean Water Act is with water, the requirement of assessing the public interest was intended only to make sure that the Corps did not casually surrender its duty to protect wetlands (and navigable waters of the United States more generally) to vague invocations of "public interest." But the Supreme Court has held that, no, the regulation is to be interpreted literally and so requires the Corps to evaluate all the factors listed in it. Cf. *United States v. Alaska*, 503 U.S. 569, 580-83 (1992). And the Corps did this, so far as it was possible to do. For in concluding that granting a Clean Water Act permit for section 3 would be in the public interest the Corps analyzed a remarkable number of public interest factors: substrate; currents, circulation or drainage patterns; suspended particulates; turbidity; water quality; flood control functions; storm, wave and

erosion buffers; erosion and creation patterns; aquifer recharge; baseflow; mixing zone; special aquatic sites; habitat for fish and other aquatic organisms; wildlife habitat; endangered or threatened species; biological availability of possible contaminants in dredged or fill material; existing and potential water supplies, water conservation, water-related recreation; aesthetics; parks, national and historic monuments, wild and scenic rivers, wilderness areas, research sites, etc.; traffic/transportation patterns; energy consumption or generation; navigation; safety; air quality; noise; historic properties; land-use qualification; economics; prime and unique farmland; food and fiber production; general water quality; mineral needs; consideration of private property; cumulative and secondary impacts; environmental justice; the relative extent of the public and private need for the proposed work; the practicability of using reasonable alternative locations and methods to accomplish the objective of the proposed structure or work; and the extent and permanence of the beneficial and/or detrimental effects the proposed structures or work may have on the public and private uses to which the area is suited.

The plaintiffs have not shown that the conclusion the Corps drew from its detailed and highly technical analysis—that section 3 of the direct route is in the public interest—was unreasonable.

It's true that the Corps hasn't done and won't be doing a public interest analysis of the entire project—all six sections. But there does not appear to be a dispute over

whether the project as a whole is contrary to the public interest—and it might be an impertinence for the Corps of Engineers to decide that a sister federal agency, the Federal Highway Administration, was proposing a project that was not in the public interest. Anyway the highway agencies' Environmental Impact Statements had covered most, maybe all, of the ground that a public interest analysis would have covered. The plaintiffs argue neither that the project as a whole is contrary to the public interest nor that it was sectioned in order to prevent consideration of its total environmental harms (improper "segmentation," discussed earlier). They may be playing a delay game: make the Corps do a public interest analysis from the ground up (along with an all-at-once six-section permit analysis) in the hope that at least until the analysis is completed there will be no further construction, so that until then the highway will end at the northernmost tip of section 3—making it a road to nowhere.

AFFIRMED.